124 T.C. No. 4

UNITED STATES TAX COURT

TERUYA BROTHERS, LTD. & SUBSIDIARIES, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 17955-03.                    Filed February 9, 2005.

    In 1995, in a series of planned transactions, P
transferred real properties to a qualified
intermediary, TGE, which then sold them to unrelated
third parties.  TGE used the sale proceeds, as well as
additional funds from P, to purchase like-kind
replacement properties for P from a corporation related
to P.

    Held:  The transactions in question were
structured to avoid the purposes of sec. 1031(f),
I.R.C., governing like-kind exchanges between related
persons.  Under sec. 1031(f)(4), I.R.C., P is not
entitled to defer gains realized on the exchanges.

Jonathan H. Steiner, William E. Bonano, and Stanley Y. Mukai, for petitioner.

Jonathan J. Ono, for respondent.

OPINION

THORNTON, Judge:  Respondent determined a $4,144,359 deficiency in petitioner's Federal income tax for its taxable year ending March 31, 1996.  The issue for decision is whether petitioner is entitled to defer gains realized on certain like-kind exchanges under section 1031(a) or must recognize gains under section 1031(f), which provides special rules governing exchanges between related persons.[1]

Background

This case is before us fully stipulated pursuant to Rule 122.  We incorporate herein the stipulated facts.  When petitioner filed its petition, its principal place of business was in Honolulu, Hawaii.

Teruya Brothers, Ltd. (Teruya), is a Hawaii corporation.  Its business activities include purchasing and developing residential and commercial real property.  During the taxable year in issue, Teruya owned 62.5 percent of the common shares of Times Super Market, Ltd. (Times).

---

[1] Section references are to the Internal Revenue Code in effect for the taxable year in issue and as amended.  Rule references are to the Tax Court Rules of Practice and Procedure.

I.   Exchanges of Properties

In 1995, Teruya engaged in two separate real property exchange transactions, referred to herein as the Ocean Vista transaction and the Royal Towers transaction.

A.   Ocean Vista Transaction

Teruya owned a fee simple interest in Ocean Vista, a parcel of land underlying the Ocean Vista Condominium complex in Honolulu, Hawaii.  Teruya's ownership interest in Ocean Vista was subject to a long-term ground lease held by Golden Century Investments Co. (Golden), which in turn was subject to a sublease held by the Association of Apartment Owners of Ocean Vista (the Association).

In March 1993, the Association inquired about buying Teruya's fee simple interest in Ocean Vista.  Teruya responded that its fee simple interest in Ocean Vista was not available. Golden then proposed acquiring Ocean Vista as part of a like-kind exchange.  In a letter of intent agreement, dated August 16, 1993, Golden agreed to purchase, and Teruya agreed to sell, Teruya's interest in Ocean Vista for $1,468,500.  An amendment to the letter of intent, dated November 2, 1993, states:  "It is understood and agreed that Teruya's obligation to sell Teruya's Interests to * * * [Golden] is conditioned upon Teruya consummating a [section] 1031 tax deferred exchange of Teruya's interests."

In June 1994, Teruya proposed buying Times's interest in "two pad sites" in Waipahu, Hawaii (these properties are hereinafter referred to collectively as Kupuohi II). Teruya's written proposal included these provisions:

> The purchase will be subject to a [section] 1031 four party exchange.

> Teruya may cancel the proposed purchase of * * * [Times's] pad sites should the Ocean Vista transaction fail to proceed according to present plans.

Times accepted Teruya's proposal.

In a letter to Teruya and Golden, dated April 3, 1995, the Association offered to purchase Teruya's fee simple interest in Ocean Vista for $1,468,500.[2] Paragraph 9 of the offer to purchase states:

> Tax-deferred Exchange. Teruya may, in its sole discretion, structure this transaction as a tax-deferred exchange pursuant to section 1031 of the Internal Revenue Code.

Paragraph 12 of the offer to purchase states:

> Conditions Precedent. The following shall be conditions precedent to the closing of the transaction contemplated hereunder: * * *
>
>     (h) Teruya shall be in a position to close on its exchange replacement properties.

On April 27, 1995, Teruya's board of directors accepted the Association's offer.

---

[2] On June 14, 1994, Teruya, Golden, and the Association executed an "Assignment, Assumption and Release", wherein the Association was substituted as a party in place of Golden.

In August 1995, Teruya entered into an "exchange agreement" with T.G. Exchange, Inc. (TGE), whereby TGE agreed to act as an "exchange party to complete the exchange" of Ocean Vista for replacement property to be designated by Teruya, with the stated purpose of qualifying the exchange under section 1031. TGE agreed to acquire the replacement property with proceeds from the sale of Ocean Vista and additional funds from Teruya as necessary to effect the acquisition. Paragraph 6 of the exchange agreement states:

> Notwithstanding the foregoing, if * * * [Teruya] is unable to locate suitable Replacement Property by the date specified in the Acquisition Agreement [for Ocean Vista], then the Acquisition Agreement and this Exchange Agreement shall be terminated and the parties shall have no further obligations to each other * * *.

Pursuant to the exchange agreement, Teruya transferred Ocean Vista to TGE, and on September 1, 1995, TGE sold Ocean Vista to the Association for $1,468,500. At that time, Teruya had a $93,270 basis in Ocean Vista.

Also on September 1, 1995, TGE applied the proceeds from the sale of Ocean Vista, as well as $1,366,056 in additional cash from Teruya, to acquire Kupuohi II from Times for $2,828,000. Times had a $1,475,361 adjusted basis in Kupuohi II and recognized a $1,352,639 gain on the sale.[3]

---

[3] The parties have stipulated that Times had a $1,475,633 basis in Kupuohi II at the time of its sale; however, this number yields computational inconsistencies with respect to other

(continued...)

At some point, TGE transferred Kupuohi II to Teruya. As of the date the petition was filed, Teruya still owned Kupuohi II.

B. <u>Royal Towers Transaction</u>

In 1994, Teruya owned a fee simple interest in the Royal Towers Apartment building (Royal Towers) in Honolulu, Hawaii. On or about December 12, 1994, Teruya and Savio Development Co. (Savio) entered into a $13.5 million contract for the sale of Royal Towers. The contract stated that the sale was subject to the "Seller [Teruya] being able to consummate [a section 1031] exchange." Teruya and Savio later agreed to decrease the price for Royal Towers from $13.5 million to $11,932,000. In April 1995, Teruya's board of directors approved the sale of Royal Towers to Savio.

In anticipation of Teruya's sale of Royal Towers, Teruya and Times previously had agreed that Teruya would purchase Times's interests in two parcels of real property in Waipahu and Aiea, Hawaii (respectively, Kupuohi I and Kaahumanu). One of the purchase terms stated:

> The purchase will be subject to a [section] 1031 four party exchange.

* * * * * * *

_____

[3](...continued)
numerical stipulations. To avoid these inconsistencies, we have found Times's adjusted basis in Kupuohi II to be $1,475,361, which is the number reflected on Times's 1995 corporate income tax return.

Teruya may cancel the proposed purchase should the sale
of the Royal Towers apartment fail to proceed according
to present plans.

Early in 1995, the boards of directors of Times and Teruya

approved the sale and purchase of Kupuohi I for $8.9 million and

Kaahumanu for $3.73 million.

In August 1995, Teruya entered into an "exchange agreement"

with TGE, whereby TGE agreed to act as an "exchange party to

complete the exchange" of Royal Towers for replacement property

to be designated by Teruya, with the stated purpose of qualifying

the exchange under section 1031.  TGE agreed to acquire the

replacement property with proceeds from the sale of Royal Towers

and additional funds from Teruya as necessary to effect the

acquisition.  Paragraph 6 of the exchange agreement states:

Notwithstanding the foregoing, if * * * [Teruya] is
unable to locate suitable Replacement Property by the
date specified in the Acquisition Agreement [for Royal
Towers], then the Acquisition Agreement and this
Exchange Agreement shall be terminated and the parties
shall have no further obligations to each other * * *.

Teruya transferred Royal Towers to TGE, and on August 24,

1995, TGE sold Royal Towers to Savio for $11,932,000.  At that

time, Teruya had a $670,506 basis in Royal Towers.

Also, on August 24, 1995, TGE applied the proceeds from the

sale of Royal Towers, as well as $724,554 in additional funds

from Teruya, to acquire Kupuohi I and Kaahumanu from Times for

$8.9 million and $3.73 million, respectively.[4]  At the time of the sales, Times had a $15,602,152 adjusted basis in Kupuohi I and a $1,502,960 adjusted basis in Kaahumanu.  Times realized a $6,453,372 capital loss on the sale of Kupuohi I but did not recognize this loss on its tax return because of the restriction on transactions between related taxpayers under section 267.[5]  Times realized and recognized a $2,227,040 gain on the sale of Kaahumanu.

At some point, TGE transferred Kupuohi I and Kaahumanu to Teruya.  As of the date the petition was filed, Teruya still owned these properties.

## II.  Federal Income Tax Return

Petitioner filed Form 1120, U.S. Corporation Income Tax Return, for its taxable year beginning April 1, 1995, and ending March 31, 1996.  Under section 1031(a)(1), petitioner deferred $1,345,169 in realized gain from the Ocean Vista transaction (after deducting claimed selling expenses of $30,061) and

---

[4] The proceeds from the sale of Royal Towers ($11,932,000) and the additional funds from Teruya ($724,554) total $12,656,554.  The agreed sale price for Kupuohi I ($8.9 million) and Kaahumanu ($3.73 million), however, totaled $12,630,000.  The parties do not explain this seeming discrepancy.

[5] The parties stipulated the $6,453,372 realized capital loss on the sale of Kupuohi I; however, on the basis of the $8.9 million sale price and the $15,602,152 adjusted basis that the parties stipulated, it appears that the loss realized was actually $6,702,152.  The parties do not address this seeming discrepancy.

$10,700,878 in realized gain from the Royal Towers transaction (after deducting claimed selling expenses of $560,616).

III. Notice of Deficiency

In the notice of deficiency, respondent determined that petitioner must recognize $12,041,026 in gains, which consists of the gains that Teruya deferred on its Federal income tax return for its taxable year ending March 31, 1996.[6]

## Discussion

This case presents an issue of first impression regarding the application of section 1031(f), which restricts nonrecognition of gain or loss with respect to like-kind exchanges between related persons.[7]

I. General Requirements for Like-Kind Exchanges

Section 1031(a)(1) generally provides that no gain or loss shall be recognized on the exchange of like-kind properties held for productive use in a trade or business or for investment. Under certain conditions, a taxpayer's nonsimultaneous transfer and receipt of like-kind properties may qualify for section 1031

---

[6] The deferred gains from the Ocean Vista and Royal Towers transactions that the parties stipulated total $12,046,047. The parties do not explain the seeming discrepancy between this figure and the $12,041,026 adjustment in the notice of deficiency.

[7] The examination in this case commenced in November 1997. Consequently, the burden of proof rule of sec. 7491(a)(1) does not apply. Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(c), 112 Stat. 727.

treatment, provided generally that the taxpayer identifies the new property within 45 days and receives it within 180 days of transferring the old property. See sec. 1031(a)(3). To facilitate such a deferred exchange, the taxpayer may use a qualified intermediary; i.e., a person who is not the taxpayer, an agent of the taxpayer, a related person to the taxpayer, or a related person to an agent of the taxpayer, see sec. 1.1031(k)-1(k), Income Tax Regs., who enters into a written exchange agreement with the taxpayer and, as required by this agreement, acquires property from the taxpayer, transfers this property, acquires like-kind replacement property, and transfers this replacement property to the taxpayer. Sec. 1.1031(k)-1(g)(4)(iii), Income Tax Regs.

Teruya used a qualified intermediary, TGE, to facilitate its transfers of Ocean Vista and Royal Towers and its acquisitions of Kupuohi II, Kupuohi I, and Kaahumanu. Respondent does not dispute that these transactions meet the general requirements for like-kind exchanges under section 1031(a)(1). Respondent contends, however, that section 1031(f) requires petitioner to recognize gains on the transactions.

## II. Rules Applicable to Related-Person Exchanges

Section 1031(f)(1) provides generally that if a taxpayer and a related person exchange like-kind property and within 2 years either one disposes of the exchanged property, the nonrecognition

provisions of section 1031(a) do not apply.  Instead, any gain or loss must be taken into account as of the date of the disposition.  As one of the few enumerated exceptions to this rule, section 1031(f)(2)(C) provides that a disposition of exchanged property will not be taken into account if "it is established to the satisfaction of the Secretary that neither the exchange nor such disposition had as one of its principal purposes the avoidance of Federal income tax."[8]

It is undisputed that Times and Teruya were related persons within the meaning of the statute.[9]  Respondent makes no argument, however, that section 1031(f)(1) applies directly to the Ocean Vista and Royal Towers transactions.[10]  Instead, respondent argues that petitioner has run afoul of section 1031(f)(4), which provides:  "This section [1031] shall not apply to any exchange which is part of a transaction (or series of

---

[8] Other exceptions, not implicated here, apply to dispositions after the death of the taxpayer or related party, see sec. 1031(f)(2)(A), and to involuntary conversions, see sec. 1031(f)(2)(B).

[9] A related person is any person bearing a relationship to the taxpayer described in sec. 267(b) or 707(b)(1).  Sec. 1031(f)(3).

[10] Respondent appears to acknowledge implicitly that sec. 1031(f)(1) applies only in the case of a direct exchange between related persons and that this case does not involve such a direct exchange.  Consistent with such a view, the regulations provide that a "qualified intermediary is not considered the agent of the taxpayer for purposes of section 1031(a)."  Sec. 1.1031(k)-1(g)(4)(i), Income Tax Regs.

transactions) structured to avoid the purposes of this subsection
[(f)]."  Inasmuch as the statute does not directly identify or
describe the purposes of subsection (f), we turn our attention to
the legislative history.

III. Legislative History:  Purposes of Section 1031(f)

Property acquired in a like-kind exchange generally takes
the basis of the property relinquished.  See sec. 1031(d).  In
other words, there is a "shifting" of tax basis between the
relinquished property and the replacement property.  See H. Conf.
Rept. 101-386, at 613 (1989).

Before 1989, Congress was concerned that because of this
basis-shifting effect, "related parties * * * engaged in like-
kind exchanges of high basis property for low basis property in
anticipation of the sale of the low basis property in order to
reduce or avoid the recognition of gain on the subsequent sale."
H. Rept. 101-247, at 1340 (1989).  In effect, because of basis
shifting, related persons were able to "cash out" of their
investments in property having an inherent gain at relatively
little or no tax cost.  See id.  Also, in some cases, basis
shifting allowed related persons to accelerate a loss on property
that they ultimately retained.  See id.  Responding to these
perceived abuses, Congress concluded that "if a related party
exchange is followed shortly thereafter by a disposition of the
property, the related parties have, in effect, 'cashed out' of

the investment, and the original exchange should not be accorded nonrecognition treatment." Id.  This policy is reflected in section 1031(f), as enacted in the Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, sec. 7601(a), 103 Stat. 2370.

Congress was also concerned that related persons not be able to circumvent the purposes of this rule by using an unrelated third party:

> Nonrecognition will not be accorded to any exchange which is part of a transaction or series of transactions structured to avoid the purposes of the related party rules.  For example, if a taxpayer, pursuant to a prearranged plan, transfers property to an unrelated party who then exchanges the property with a party related to the taxpayer within 2 years of the previous transfer in a transaction otherwise qualifying under section 1031, the related party will not be entitled to nonrecognition treatment under section 1031. [H. Rept. 101-247, supra at 1341.]

Equating a qualified intermediary with the "unrelated party" referred to in the above-quoted example, respondent reads the example to mean that a deferred exchange between related parties, involving a qualified intermediary, should be recast as a direct exchange between the related parties.  If section 1031(f)(1) would preclude nonrecognition treatment for the recast transaction, respondent concludes, then the deferred exchange should be deemed to have been structured to avoid the purposes of section 1031(f).  Respondent suggests that such an analysis ends the inquiry under section 1031(f)(4).

Although respondent's argument has superficial appeal, it is only loosely grounded in the above-quoted, highly elliptical example in the legislative history. Cf. Mandarino, "Reconciling Rulings on Related Party Like-Kind Exchanges", 30 Real Estate Taxn. 174, 175 (Third Quarter 2003) ("Because of the way this example is drafted, it appears not to make the point for which it is offered."). Moreover, respondent's analysis fails to consider the non-tax-avoidance exception of section 1031(f)(2)(C).[11] Because this exception is subsumed within the purposes of section 1031(f), any inquiry into whether a transaction is structured to avoid the purposes of section 1031(f) should also take this exception into consideration.

Petitioner seems to suggest that Congress intended section 1031(f) to apply only insofar as the taxpayer fails to "continue its investment" in property that it receives in a related-person deferred exchange. Petitioner seems to suggest that what happens to the relinquished property is of no consequence. We reject any such suggestion as flatly contrary to section 1031(f), which applies with equal force to postexchange dispositions by either the taxpayer or the related person.

---

[11] As previously discussed, in the context of a direct exchange between related parties, sec. 1031(f)(2)(C) allows the taxpayer to establish that neither the exchange nor the disposition had as one of its principal purposes the avoidance of Federal income tax.

IV.  Analysis of the Ocean View and Royal Towers Transactions

Teruya exchanged Ocean View and Royal Towers for like-kind replacement properties formerly owned by Times.  A qualified intermediary immediately sold Ocean Vista and Royal Towers to unrelated third parties.  Times received the proceeds, plus additional cash from Teruya.

These transactions are economically equivalent to direct exchanges of properties between Teruya and Times (with boot from Teruya to Times), followed by Times's sales of the properties to unrelated third parties.  The interposition of a qualified intermediary in these transactions cannot obscure the end result.  Petitioner offers no explanation for structuring the Ocean Vista and Royal Towers transactions as it did, and the record discloses no reason (other than seeking to avoid the section 1031(f) rules) for Teruya's using a qualified intermediary to accomplish the transactions.  Under the circumstances, we are led to the conclusion that Teruya used the multiparty structures to avoid the consequences of economically equivalent direct exchanges with Times.  As discussed below, petitioner has failed to establish that avoidance of Federal income taxes was not one of the principal purposes of the Ocean Vista and Royal Towers transactions.

## V.  Non-Tax-Avoidance Exception

Petitioner argues that Teruya's continued investment in like-kind properties meets the requirements of the non-tax-avoidance exception under section 1031(f)(2)(C), as subsumed within section 1031(f)(4).  Section 1031(f)(2)(C) provides that there shall not be taken into account any disposition "with respect to which it is established to the satisfaction of the Secretary that neither the exchange nor such disposition had as one of its principal purposes the avoidance of Federal income tax."[12]

With respect to both the Ocean Vista and Royal Towers transactions, petitioner contends that "there was no intent to disguise an actual sale of the relinquished property in order to reduce or avoid gain recognition on such sale, because a sale of the relinquished property was not intended in the first place." In other words, petitioner contends that from the outset of both transactions, Teruya intended to qualify for deferred like-kind exchange treatment and did not intend to make direct sales of the properties.  Petitioner points to the fact that Teruya, Times, Golden, the Association, and Savio agreed in various documents

---

[12] In other contexts involving similar language, we have applied a "strong proof" standard.  See, e.g., Schoneberger v. Commissioner, 74 T.C. 1016, 1024 (1980).  Because it makes no difference to the outcome of this case, we do not apply any heightened standard of proof.

that the Ocean Vista and Royal Towers transactions were conditional on effecting a section 1031 exchange.

Petitioner's contentions might be relevant in determining whether a transaction is in substance an exchange or a sale of like-kind property. See Alderson v. Commissioner, 317 F.2d 790 (9th Cir. 1963), revg. 38 T.C. 215 (1962). In the instant case, however, they have little relevance. In the first instance, respondent does not contend that the transactions in question were disguised sales or otherwise fail to meet the general requirements of section 1031(a)(1). More fundamentally, section 1031(f) presupposes that an exchange to which it applies otherwise meets the requirements of section 1031(a)(1). See sec. 1031(f)(1)(B). Even if Teruya never intended to make a direct sale of the relinquished properties, this does not mean that section 1031(f) is not implicated or that the deferred sale was not structured so as to avoid Federal income taxes. The economic substance of the transactions remains that the investments in Ocean Vista and Royal Towers were cashed out immediately and Times, a related person, ended up with the cash proceeds.

With respect to the Ocean Vista transaction, petitioner contends that there was no tax avoidance purpose because Times recognized a gain on its sale of Kupuohi II ($1,352,639) that was larger than the gain Teruya would have recognized ($1,345,169)

had it sold Ocean Vista directly to the Association for cash.[13]
Although Times recognized a gain in the Ocean Vista transaction
that slightly exceeded Teruya's gain deferral, it appears that
Times paid a much smaller tax price for that gain recognition
than Teruya would have paid if it had recognized gain in a direct
sale of Ocean Vista.  On its corporate income tax return for
taxable year ending March 31, 1996, Teruya reported taxable
income of $2,060,806.  Consequently, if Teruya had made a direct
sale of Ocean Vista, the gain recognized on that sale presumably
would have been taxable at a 34-percent corporate income tax
rate.  See sec. 11(b)(1)(C).  By comparison, on its Form 1120 for
its taxable year ending April 25, 1996, Times reported a net
operating loss (NOL) of $1,043,829.  Thus, although Times
recognized a considerable gain on the Ocean Vista transaction,
because of offsetting expenses, it did not incur tax on that
gain.  Instead, the only tax consequences of Times's gain
recognition were reductions of its NOL for its taxable year
ending April 25, 1996, and of its NOL carryovers for subsequent
taxable years.

---

[13] The $1,345,169 figure includes approximately $30,061 in
claimed selling expenses that Teruya deducted in computing its
sec. 1031(a) deferral.  Petitioner assumes that Teruya would have
incurred these same selling expenses in a direct sale of Ocean
Vista.

In sum, petitioner has failed to persuade us that avoidance of Federal income tax was not one of the principal purposes of the Ocean Vista and Royal Towers transactions.

VI. Conclusion

Petitioner offers no explanation for Teruya's use of the qualified intermediary in the Ocean Vista and Royal Towers transactions. We infer that the qualified intermediary was interposed in an attempt to circumvent the section 1031(f)(1) limitations that would have applied to exchanges directly between related persons. Petitioner has failed to show that avoidance of Federal income tax was not one of the principal purposes of the Ocean Vista and Royal Towers transactions. We conclude that these transactions were structured to avoid the purposes of section 1031(f). Consequently, petitioner is not entitled, under

section 1031(a)(1), to defer the gains that it realized on the exchanges of Ocean Vista and Royal Towers.[14]

An appropriate order will be issued denying petitioner's motion to supplement the record, and decision will be entered for respondent.

---

[14] On Sept. 8, 2004, petitioner filed a motion to supplement the record with three letters from respondent to petitioner. Each of these letters concerns a technical advice memorandum that involves a multiparty transaction among a taxpayer, a qualified intermediary, and a related person. In a rambling 96-page reply brief, petitioner contends that these letters provide an abundance of evidence that respondent has been improperly administering sec. 1031(f)(4). Because we find that the letters petitioner submitted have no relevance to the issues in this case, we will deny petitioner's motion to supplement the record.