132 T.C. No. 6

UNITED STATES TAX COURT

OCMULGEE FIELDS, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 967-07.                    Filed March 31, 2009.

P transferred appreciated real property to a
qualified intermediary, which sold the property and
used the proceeds to purchase from a person related to
P like-kind property, which it transferred to P.

Held:  P has failed to prove the absence of a
principal purpose of Federal income tax avoidance; P's
exchange with the qualified intermediary is part of a
transaction structured to avoid the purposes of sec.
1031(f), I.R.C., governing like-kind exchanges between
related persons, and, under sec. 1031(f)(4), I.R.C.,
the nonrecognition provisions of sec. 1031, I.R.C., do
not apply to the exchange.

David D. Aughtry and David W. Siegel, for petitioner.

Vicki J. Hyche and Clinton M. Fried, for respondent.

HALPERN, Judge: By notice of deficiency (the notice), respondent determined a deficiency of $2,015,862 in petitioner's Federal income tax for its taxable year ended May 31, 2004 (taxable year 2004), and an accuracy-related penalty of $403,172.

Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986, as amended and in effect for taxable year 2004, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The deficiency determination is the result of respondent's adjustment requiring that petitioner recognize the gain it realized on the following transaction: (1) Petitioner transferred appreciated real property to a "qualified intermediary" (qualified intermediary), (2) an unrelated third party purchased the property from the qualified intermediary for cash, (3) a person related to petitioner sold like-kind property to the qualified intermediary for cash, (4) the qualified intermediary transferred the like-kind property to petitioner, and (5) petitioner realized a gain on the exchange. Petitioner claims that its exchange is a nontaxable exchange under the so-called like-kind exchange rules found in section 1031. Respondent claims that section 1031(f)(4) requires recognition because petitioner "structured" the transaction "to avoid the purposes" of the rules for exchanges between related persons. Respondent concedes that, but for the application of section

1031(f)(4), petitioner's exchange with the qualified intermediary qualifies for nonrecognition treatment under section 1031. Because we agree with respondent, we deny petitioner nonrecognition under section 1031(a)(1). We do not sustain respondent's determination of an accuracy-related penalty.

FINDINGS OF FACT

Some facts have been stipulated and are so found. The stipulation of facts, with attached exhibits, is incorporated herein by this reference. Petitioner is a corporation organized in the State of Georgia. At the time it filed the petition, its principal place of business was in Macon, Georgia (Macon).

Petitioner

Petitioner was organized in 1973 by Charles H. Jones (Charles Jones). Petitioner develops, owns, and manages real estate located primarily in middle Georgia, an area including Macon. During taxable year 2004, petitioner's principal shareholders were Charles Jones, his sons Dwight C. and C. Jefferson (Dwight Jones and Jeff Jones, respectively), and Jones Family Partnership, which was owned one-third each by Charles Jones, Dwight Jones, and Jeff Jones. During taxable year 2004, Dwight Jones was president of petitioner.

During taxable year 2004, Charles Jones, his sons, and their related entities were among the largest owners of commercial property, including shopping centers and office buildings, in

middle Georgia.  At the beginning of taxable year 2004, petitioner's real properties included the Wesleyan Station Shopping Center (Wesleyan Station) and part of the Rivergate Shopping Center (Rivergate), both in Macon.

The term "Barnes & Noble Corner" is the term petitioner uses (which we shall adopt) to describe three parcels of real property in Rivergate.  Petitioner had owned the Barnes & Noble Corner before selling it in 1996 to Treaty Fields, L.L.C. (Treaty Fields).  At the time of that sale, the Barnes & Noble Corner was undeveloped real property.  Petitioner sold it so that the benefit of developing it would accrue to Treaty Fields.

Treaty Fields

Treaty Fields is a Georgia limited liability company that Dwight Jones organized in 1996.  At all times here pertinent, it was owned by Dwight Jones and Charles Jones.

The McEachern Agreement

During the spring of 2003, Dwight Jones met Scott Wilson (Mr. Wilson), a licensed real estate broker.  Mr. Wilson told Dwight Jones that he was looking for income-producing commercial real estate.  He asked him whether petitioner had any for sale. They discussed Wesleyan Station.  Although petitioner had not listed Wesleyan Station for sale or otherwise marketed it, petitioner agreed to sell it.  On July 17, 2003, petitioner entered into an agreement (the McEachern agreement) for the sale

of Wesleyan Station to two testamentary trusts under the will of John McEachern and to Mr. Wilson (the son-in-law of John McEachern). Among other things, the McEachern agreement provides: (1) The purchase price would be $7,250,000, (2) the closing would take place on or before October 10, 2003, (3) petitioner intended to conduct the transaction as part of an exchange of property qualifying for nonrecognition to petitioner under section 1031, and (4) in light of (3), petitioner could assign its interest in the agreement to a qualified intermediary.

Petitioner's Search for Replacement Property

Raymond Pippin (Mr. Pippin) is a certified public accountant (C.P.A.) and a member of the Macon accounting firm McNair, McLemore, Middlebrooks & Co., L.L.P. (McNair). McNair is the largest accounting firm in the Macon area, and it has as clients more real estate developers than any other accounting firm in Macon. Mr. Pippin services more of those clients (including petitioner) than anyone else at McNair. Even before petitioner entered into the McEachern agreement, Dwight Jones had asked Mr. Pippin whether he was aware of any income-producing commercial real property in the Macon area that could be acquired to replace Wesleyan Station. Petitioner's requirements for replacement property were that it be income-producing commercial real property in middle Georgia worth more than $7 million. Mr. Pippin indicated that he was not aware of any such property, and

Dwight Jones asked him to keep his eyes open.  Dwight Jones also asked petitioner's real estate lawyer and two commercial real estate brokers to help him find suitable replacement property. In addition, Mr. Wilson (also a broker) offered to help petitioner find replacement property.

As stated, the deadline for closing the McEachern agreement was October 10, 2003.  Before that date, petitioner had considered and rejected for various reasons at least six possible replacement properties presented by brokers.  As the date approached, Dwight Jones considered the possibility of petitioner's reacquiring the Barnes & Noble Corner as replacement property.

On October 9, 2003, petitioner engaged Security Bank of Bibb County, Macon, Georgia (Security Bank), as a qualified intermediary.  On that date, it assigned its rights to sell Wesleyan Station to Security Bank.  On October 10, 2003, Security Bank, as a qualified intermediary for petitioner, sold Wesleyan Station as called for in the McEachern agreement.

Petitioner's Receipt of the Barnes & Noble Corner

Petitioner settled on the Barnes & Noble Corner as appropriate replacement property.  On October 15, 2003, petitioner and Treaty Fields entered into a contract of purchase with respect to that property.  Petitioner subsequently transferred its rights under that contract to Security Bank, and

petitioner received the Barnes & Noble Corner on November 4, 2003. Treaty Fields filed a Form 1065, U.S. Return of Partnership Income, for 2003, reporting the disposition of the Barnes & Noble Corner as a taxable sale. It reported that the amount realized on the sale was $6,740,900,[1] its adjusted basis in the property sold was $2,554,901, and it realized a gain of $4,185,999.

Petitioner's Taxable Year 2004 Federal Income Tax Return

For taxable year 2004, petitioner filed Form 1120, U.S. Corporation Income Tax Return (petitioner's 2004 Form 1120). Petitioner reported the disposition of Wesleyan Station as a like-kind exchange on an attached Form 8824, Like-Kind Exchanges. It reported that the amount realized on the exchange was $6,838,900, its adjusted basis in the property exchanged and its expenses related to the exchange were $716,164, and it realized a gain of $6,122,736. It reported that its basis in the property received (the Barnes & Noble Corner) was $716,164, and, under the heading of part II, "Related Party Exchange Information", it identified Treaty Fields as the related party. It also reported on another form installment sale income of $475,396, resulting from the acceleration of payments due petitioner from Treaty

---

[1] We recognize that $6,740,900 differs from both the purchase price of $7,250,000 stated in the McEachern agreement and the $6,838,900 reported as realized by petitioner on its 2004 Form 1120. See infra. Those discrepancies do not bother the parties and, therefore, do not bother us.

Fields on account of petitioner's previous 1996 sale of the Barnes & Noble Corner to Treaty Fields.

Mr. Pippin prepared petitioner's 2004 Form 1120, including Form 8824. Charles Jones and Dwight Jones had great confidence in Mr. Pippin. They had relied on him and his firm for tax advice for many years. They relied on him to prepare properly petitioner's 2004 Form 1120.

Respondent's Determination

Respondent's determination of a deficiency is principally based on his adjustment increasing petitioner's gross income by $6,122,736 on account of its exchange with Security Bank of Wesleyan Station for the Barnes & Noble Corner. Respondent explained his adjustment in an attachment to the notice as follows: "[Y]ou have not established that you have met all of the requirements of Section 1031(f) for nonrecognition of that gain."

OPINION

I. Introduction

We shall first address the deficiency in tax and then address the accuracy-related penalty.

II. The Deficiency in Tax

A. Introduction

Petitioner reported on its 2004 Form 1120 that it realized a gain of $6,122,736 on its exchange of one parcel of real property

(Wesleyan Station) for three others (the Barnes & Noble Corner). The only question we must answer is whether the exchange fails to qualify for nonrecognition treatment under section 1031(a) on account of the special rules applicable to exchanges between related persons found in section 1031(f). We shall describe the relevant provisions of section 1031 and the accompanying regulations, set forth the parties' arguments, settle two questions with respect to proof, and make our analysis. As stated, we conclude that petitioner does not qualify for nonrecognition under section 1031(a).

B. Section 1031

Section 1031(a)(1) provides that no gain or loss shall be recognized on the exchange of property held for productive use in a trade or business or for investment if the property is exchanged solely for property of a like kind that is to be held either for productive use in a trade or business or for investment. Under section 1031(d), the basis of property acquired in a section 1031 exchange is the same as the basis of the property exchanged, decreased by any money the taxpayer receives and increased by any gain the taxpayer recognizes.

Section 1031 and the regulations thereunder allow for deferred exchanges of property. Under section 1031(a)(3) and section 1.1031(k)-1(b), Income Tax Regs., however, the property a taxpayer receives in the exchange (replacement property) must be

(1) identified within 45 days of the transfer of the property relinquished in the exchange (relinquished property) and (2) received by the earlier of 180 days after the transfer of the relinquished property or the due date (including extensions) of the transferor's tax return for the taxable year in which the relinquished property is transferred.

Section 1.1031(k)-1(g)(4), Income Tax Regs., allows a taxpayer to use a qualified intermediary to facilitate a like-kind exchange.  The qualified intermediary is not considered the agent of the taxpayer for purposes of section 1031(a).  Sec. 1.1031(k)-1(g)(4)(i), Income Tax Regs.  In the case of a transfer of relinquished property involving a qualified intermediary, the taxpayer's transfer of relinquished property to a qualified intermediary and subsequent receipt of like-kind replacement property from the qualified intermediary is treated as an exchange with the qualified intermediary.  Id.

Section 1031(f) provides special rules for property exchanged between related persons.  In pertinent part, it provides as follows:

> SEC. 1031(f).  Special Rules for Exchanges Between Related Persons.--
>
> (1) In general.--If-
>
> (A) a taxpayer exchanges property with a related person,
>
> (B) there is nonrecognition of gain or loss to the taxpayer under this

section with respect to the exchange of such property (determined without regard to this subsection), and

    (C) before the date 2 years after the date of the last transfer which was part of such exchange--

        (i) the related person disposes of such property, or

        (ii) the taxpayer disposes of the property received in the exchange from the related person which was of like kind to the property transferred by the taxpayer,

there shall be no nonrecognition of gain or loss under this section to the taxpayer with respect to such exchange * * *.

    (2) Certain dispositions not taken into account.-- For purposes of paragraph (1)(C), there shall not be taken into account any disposition--

    *    *    *    *    *    *    *

    (C) with respect to which it is established to the satisfaction of the Secretary that neither the exchange nor such disposition had as one of its principal purposes the avoidance of Federal income tax.

    *    *    *    *    *    *    *

    (4) Treatment of certain transactions.-- This section shall not apply to any exchange which is part of a transaction (or series of transactions) structured to avoid the purposes of this subsection.

C.  Arguments of the Parties

1.  Petitioner's Arguments

Petitioner's argument with respect to section 1031(f) is straightforward.  On or before the date it entered into the McEachern agreement, petitioner formed a plan to replace Wesleyan Station with property from an unrelated person.  Only when its search for appropriate property owned by an unrelated person proved unfruitful and the deadline to close under the McEachern agreement approached did petitioner consider replacing Wesleyan Station with the Barnes & Noble Corner.  It chose to do so for business reasons (to reunite its ownership of the Barnes & Noble Corner with its ownership of the rest of Rivergate) and in the face of advice from its accountant and tax adviser (Mr. Pippin) that the decision would result in higher taxes.  Therefore, concludes petitioner, it lacked intent to avoid the provisions of section 1031(f).  Petitioner also argues that respondent bears the burden of proof.

2.  Respondent's Arguments

Respondent's argument with respect to section 1031(f) is equally straightforward.  The facts in this case are similar to those in Teruya Bros., Ltd. & Subs. v. Commissioner, 124 T.C. 45 (2005), a case involving the section 1031 rules applicable to exchanges between related persons.  In that case, we found that a qualified intermediary was interposed in an attempt to circumvent

the limitation in section 1031(f)(1) that would have applied to an exchange directly between related persons, and the taxpayer failed to show that tax avoidance was not one of the principal purposes of the transactions. We concluded that the transactions were structured to avoid the purposes of section 1031(f) and, consequently, pursuant to section 1031(f)(4), the taxpayer was not entitled to nonrecognition under section 1031(a)(1). Respondent argues for the same result here.

Respondent denies that he bears the burden of proof.

D. Questions Relating to Proof

1. Burden of Proof

The parties argue over who bears the burden of proof, particularly with respect to petitioner's eligibility for the non-tax-avoidance exception found in section 1031(f)(2)(C). Petitioner argues that respondent bears the burden for three reasons.

First, petitioner argues that respondent bears the burden of proof because his explanation of his adjustment increasing petitioner's gross income (viz, "you have not established that you have met all of the requirements of Section 1031(f) for nonrecognition") is inadequate because it "contains no affirmative factual determination that could be presumptively correct." Petitioner's argument is misguided. There is no requirement that a notice of deficiency that adequately informs

the taxpayer of the basis for the deficiency contain a factual determination. Often, particularly with respect to deductions, we have said: "[A] taxpayer bears the burden of proof, and respondent's determinations are entitled to a <u>presumption of correctness</u>." E.g., <u>Shafrir v. Commissioner</u>, T.C. Memo. 2008-280 (emphasis added). That does not require that the Commissioner lay out the factual predicate for his determination. The determination referred to is the Commissioner's deficiency determination, not any underlying factual determination. See sec. 6212(a) ("If the Secretary determines that there is a deficiency".). Section 7522(a) requires that the notice "describe the basis for, and identify the amounts (if any) of, the tax due, interest, additional amounts, additions to the tax, and assessable penalties included in such notice." The final sentence of section 7522(a) provides: "An inadequate description under the preceding [quoted] sentence shall not invalidate such notice." Respondent's explanation of his deficiency determination informed petitioner that it was required to recognize gain because it had not established that it had satisfied the section 1031(f) special rules applicable to like-kind exchanges between related parties. In that respect, <u>Shea v. Commissioner</u>, 112 T.C. 183, 192 (1999), is distinguishable. The notice was adequate in all respects, and there is nothing about

respondent's explanation of his adjustment that bears on who bears the burden of proof.

Second, petitioner argues that respondent bears the burden of proof because "the 'failure-to-establish' non-assertion is arbitrary and capricious", purportedly because respondent failed to consider intent. We believe that petitioner's second argument is directed to the section 1031(f)(2)(C) requirement that the taxpayer establish the absence of a principal purpose of tax avoidance. We do so because, in its reply brief, under the heading "Burden of Proof", petitioner incorporates a portion of its pretrial memorandum in which it states: "In particular, nowhere does the Notice contain the Section 1031(f)(2)(C) statutorily-mandated determination as to the presence or absence of a principal purpose of tax avoidance." As established in the immediately preceding paragraph, the notice is sufficient. Moreover, as discussed infra in section II.E.2.b. of this report, the evidence establishes that, because of a deemed exchange, basis shift, and sale of Wesleyan Station by Treaty Fields, petitioner and Treaty Fields avoided approximately $1.8 million of gain recognition. Respondent makes clear in his pretrial memorandum his assumption that the deemed exchange and sale had as a principal purpose Federal income tax avoidance. We find that assumption neither arbitrary nor capricious. Petitioner has failed to convince us with its second argument that respondent

bears the burden of proving that petitioner had a principal purpose of tax avoidance.

Finally, petitioner argues that respondent bears the burden of proof under section 7491(a)(1). In pertinent part, Rule 142(a)(1) provides, as a general rule: "The burden of proof shall be upon the petitioner". In certain circumstances, however, if the taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the proper tax liability, section 7491 places the burden of proof on the Commissioner. See sec. 7491(a)(1); Rule 142(a)(2). Credible evidence is evidence that, after critical analysis, a court would find constituted a sufficient basis for a decision on the issue in favor of the taxpayer if no contrary evidence were submitted. Baker v. Commissioner, 122 T.C. 143, 168 (2004); Bernardo v. Commissioner, T.C. Memo. 2004-199 n.6. Petitioner's argument fails because, for the reasons discussed infra in section II.E.2.b. of this report, petitioner has not introduced credible evidence of the absence of a principal purpose of tax avoidance.[2] It follows that petitioner retains the burden of proving the absence of that prohibited purpose, a burden that, because of the absence of credible evidence on that issue, petitioner cannot sustain. See Bernardo v. Commissioner, supra n.7; see also

---

[2] See the discussion infra in sec. II.D.2. of this report as to what would constitute credible evidence in this case.

Rendall v. Commissioner, 535 F.3d 1221, 1225 (10th Cir. 2008) (citing Bernardo), affg. T.C. Memo. 2006-174.  Therefore, our discussion of that issue may be viewed as setting forth the basis for our determination that petitioner has failed to (1) introduce credible evidence and (2) carry its burden of proof.  See Bernardo v. Commissioner, supra; see also Rendall v. Commissioner, supra at 1225.

### 2.  Measure of Persuasion

To satisfy the non-tax-avoidance exception found in section 1031(f)(2)(C), the Secretary must be satisfied as to the absence of a principal purpose of Federal income tax avoidance. Respondent "acknowledges that the Secretary's discretion is not limitless."  He argues that, nevertheless, the measure of persuasion that petitioner must satisfy to show that the Secretary abused his discretion is great, and to satisfy that measure petitioner must show by "substantial evidence" the absence of the prohibited purpose.  Petitioner argues for a "strong proof" measure.  In Teruya Bros., Ltd. & Subs. v. Commissioner, 124 T.C. at 54 n.12, we stated that, although we have applied a "strong proof" measure in other contexts involving language similar to the "satisfaction of the Secretary" language in section 1031(f)(2)(C), because the measure made no difference to the outcome of the case, we would not apply a more than usual measure of persuasion.  Here, the measure of persuasion also

makes no difference. Petitioner cannot satisfy the usual measure of persuasion required to prove a fact in this court; viz, a preponderance of the evidence. See Merkel v. Commissioner, 109 T.C. 463, 476 (1997), affd. 192 F.3d 844 (9th Cir. 1999).

E. Analysis

1. Avoiding the Purposes of the Rules Governing Exchanges Between Related Parties

Petitioner is denied nonrecognition treatment on its exchange of Wesleyan Station with Security Bank for the Barnes & Noble Corner if the exchange was part of a transaction or series of transactions structured to avoid the purposes of the rules found in section 1031(f) governing exchanges between related persons. See sec. 1031(f)(4). We begin by considering the history of those rules and our interpretation of them in Teruya Bros.

Replacement property acquired in a like-kind exchange generally takes the basis of the property relinquished. See sec. 1031(d). In effect, the basis of the relinquished property shifts to the replacement property. In the absence of the general rule of section 1031(f)(1), a taxpayer anticipating the sale of low basis property might be tempted to exchange the low basis property for high basis property owned by a related person, with the related person then selling the property received in the exchange at a reduced gain (or possibly a loss) because of the shift to that property of his high basis in the property he

relinquished.[3]  See <u>Teruya Bros., Ltd. & Subs. v. Commissioner</u>, <u>supra</u> at 51-53.  In <u>Teruya Bros.</u>, we said this about the history of section 1031(f):  "Congress concluded that if a related party exchange is followed shortly thereafter by a disposition of the property, the related parties have, in effect, 'cashed out' of the investment, and the original exchange should not be accorded nonrecognition treatment."  <u>Id.</u> at 52 (certain quotation marks and citation omitted).  We explained section 1031(f)(4) as reflecting Congress's concern that related persons not be able to circumvent the purposes of section 1031(f)(1) by interposing an exchange with an unrelated third party.  <u>Id.</u>

The essential facts of <u>Teruya Bros.</u> are as follows.  The taxpayer negotiated the sale of relatively low basis real property to an unrelated person.  In anticipation of the sale, the taxpayer arranged to purchase relatively high basis replacement property from a related person.  To carry out the transaction, the taxpayer arranged for a qualified intermediary to acquire the property the taxpayer had agreed to sell and to sell it to the unrelated person, to use the proceeds to purchase the replacement property from the related person, and then to transfer that replacement property to the taxpayer.

---

[3] Or if the property he receives is received in an exchange not qualifying for nonrecognition treatment, at his tax cost for that property.  See sec. 1012; <u>Phila. Park Amusement Co. v. United States</u>, 130 Ct. Cl. 166, 126 F. Supp. 184, 189 (1954).

In <u>Teruya Bros., Ltd. & Subs. v. Commissioner</u>, <u>supra</u> at 53, we concluded that the described transaction was economically equivalent to a direct exchange of properties between the taxpayer and the related person, followed by the related person's sale of the property it received to an unrelated third party. We stated that the interposition of a qualified intermediary in the transactions could not obscure the end result. <u>Id.</u> Because the deemed exchange and sale was described in section 1031(f)(1), we then looked to see whether avoidance of Federal income tax was one of the principal purposes of the deemed exchange. <u>Id.</u> at 54. We did so because we had concluded that the non-tax-avoidance exception of section 1031(f)(2)(C) "is subsumed within the purposes of section 1031(f), [and] any inquiry into whether a transaction is structured to avoid the purposes of section 1031(f) should * * * take this exception into consideration." <u>Id.</u> at 53. We rejected the taxpayer's argument that it met the requirements of the exception. We restated our observation: "The economic substance of the transactions remains that the investments in * * * [the relinquished properties] were cashed out immediately and * * * [the related person] ended up with the cash proceeds." <u>Id.</u> at 55. We detailed the tax savings to the taxpayer and the related person resulting from the redirection of the proceeds from the sale of the relinquished property to the related person. <u>Id.</u> We concluded that (1) the taxpayer had

failed to prove that tax avoidance was not one of the principal purposes of the two transactions and (2) the taxpayer had interposed the qualified intermediary to avoid the tax consequences of an economically equivalent direct exchange with the related person.  Id. at 54-55.

### 2.  Non-Tax-Avoidance Exception

#### a.  Introduction

The transaction at bar is similar to the transaction in Teruya Bros.  Petitioner exchanged Wesleyan Station with a third party, Security Bank, a qualified intermediary, for replacement property, the Barnes & Noble Corner, formerly owned by a related person, Treaty Fields.  Between the two legs of that exchange, Security Bank sold Wesleyan Station to an unrelated third party and used the proceeds to acquire the replacement property from Treaty Fields.  Petitioner does not dispute that, within the meaning of section 1031(f)(3), Treaty Fields is a related person.

To determine whether petitioner's exchange with Security Bank was part of a transaction or series of transactions structured to avoid the purposes of section 1031(f), we must disregard that exchange and consider how petitioner would have fared had it instead exchanged Wesleyan Station with Treaty Fields for the Barnes & Noble Corner and had Treaty Fields then sold Wesleyan Station.  We must determine whether, assuming those

hypothetical facts, petitioner has shown the absence of a principal purpose of Federal income tax avoidance.

> b.  Application of Section 1031(f)(2)(C) to the Deemed Exchange

Petitioner must establish that neither its deemed exchange of Wesleyan Station with Treaty Fields nor Treaty Fields's deemed sale of that property had avoidance of Federal income tax as one of its principal purposes.  See sec. 1031(f)(2)(C).

H. Conf. Rept. 101-386 (1989) is the report of the committee of conference (the conference report) that accompanied H.R. 3299, 101st Cong., 1st Sess. (1989), which, as enacted, became the Omnibus Budget Reconciliation Act of 1989 (OBRA), Pub. L. 101-239, 103 Stat. 2106.  OBRA section 7601(a), 103 Stat. 2370, added section 1031(f).  With respect to that addition, the conference report states:

> The Senate amendment is the same as the House bill, except that the * * * [Committee on Finance] report provides that the non-tax avoidance exception generally will apply to (1) transactions involving certain exchanges of undivided interests, (2) dispositions in nonrecognition transactions, and (3) transactions that do not involved [sic] the shifting of basis between properties.  [H. Conf. Rept. 101-386, supra at 614].

The conference report further states that (with respect to the addition of section 1031(f)) the conference agreement follows the Senate amendment.  Id.

If Treaty Fields had received Wesleyan Station from petitioner in exchange for the Barnes & Noble Corner, Treaty

Fields's adjusted basis of $2,554,901 in the Barnes & Noble Corner would have shifted to Wesleyan Station (which, in petitioner's hands, had a basis of only around $716,164). Because of that step-up in basis, Treaty Fields would have realized a gain on the sale of Wesleyan Station approximately $1.8 million less than petitioner would have realized had it forgone an exchange with Treaty Fields and sold Wesleyan Station itself. While the conference report identifies transactions not involving basis shifting as transactions generally lacking Federal income tax avoidance as a principal purpose, a fair inference to be drawn from the report is that Federal income tax avoidance generally is a principal purpose of transactions involving basis shifting. Indeed, petitioner appears to concede the point: "[I]f all other factors were equal * * *, a basis differential may supply the principal purpose of tax avoidance." Petitioner adds: "It is equally true, however, that the tax impact of a basis differential may be overridden and reversed by more important tax considerations such as rate differentials, lost elections, and the like--not to mention non-tax considerations." Petitioner lists five "monumental" tax factors that, it argues, override the basis differential that it concedes existed here:

> (i) the immediate tax on Treaty Fields' sale of the Barnes & Noble Corner, (ii) the immediate tax to * * * [petitioner] on the outstanding installment note from Treaty Fields from the earlier sale of the Barnes &

Noble Corner to Treaty Fields, (iii) the decrease in depreciation on the Barnes & Noble Corner, (iv) the 34% tax on * * * [petitioner] rather than the 15% tax rate Treaty Fields' partners would have had on the future sale of the Barnes & Noble Corner, and (v) the sacrifice of the Section 754 election for Charles Jones [upon his death] which would entirely eliminate 70 percent of the gain from the future sale of the Barnes & Noble Corner to a third party if Treaty Fields had retained ownership.

Although there may be situations in which a taxpayer can overcome the negative inference to be drawn from basis shifting and a "cash out", this is not one of them. Our reaction to petitioner's five "monumental" tax factors is as follows. First, indeed there was an immediate tax on Treaty Fields's sale of the Barnes & Noble Corner, but that tax was approximately equal to the tax it would have paid had it first exchanged the Barnes & Noble Corner for Wesleyan Station and then sold Wesleyan Station. Second, while Treaty Fields's sale of the Barnes & Noble Corner resulted in the acceleration of $475,396 in installment income to petitioner, the result was not the addition of some new tax burden but merely the acceleration of a deferred tax burden, equivalent in consequence to the early call of a loan. Petitioner has failed to quantify the associated cost, which surely was much less than $475,396. Third, petitioner's adjusted basis in Wesleyan Station shifted to the Barnes & Noble Corner and, therefore, it gave up no depreciable basis. Treaty Fields's adjusted basis in the Barnes & Noble Corner offset the amount it realized on the sale of that property to Security Bank. The

proceeds of the sale, perhaps reduced by a distribution to Treaty Fields's members to pay tax, were available for reinvestment in new depreciable property.  Fourth, petitioner focuses on the tax rate differential between gain taxable to petitioner (34 percent) and gain taxable to Treaty Fields's members (15 percent, Treaty Fields being a pass-through entity whose members (individuals) are taxed on capital gains at rates not available to corporate taxpayers, like petitioner).  Petitioner ignores that, if its exchange with Security Bank is recast as an exchange with Treaty Fields followed by Treaty Fields's sale of Wesleyan Station, the deemed exchange not only shifted Treaty Fields's basis in the Barnes & Noble Corner to Wesleyan Station, reducing the amount of gain deemed recognized by Treaty Fields, but also subjected that gain to the 15-percent tax rate on gain taxable to Treaty Fields's members rather than the 34-percent tax rate that petitioner would have incurred had it sold the property itself. Moreover, petitioner's supposition as to what tax petitioner might pay in the future on a supposed taxable sale of the Barnes & Noble Corner is too speculative for us to take into account, as is petitioner's fifth argument concerning a section 754 election made following Charles Jones's death.

We are not prepared to say that, as a matter of law, a finding of basis shifting precludes the absence of a principal purpose of tax avoidance, but, in this case, the immediate tax

consequences resulting from petitioner's deemed exchange with Treaty Fields included an approximately $1.8 million reduction in taxable gain and the substitution of a 15-percent tax rate for a 34-percent tax rate. The tax savings are plain, and petitioner's counterfactors are unconvincing or speculative. Petitioner has failed to convince us that tax avoidance was not a principal purpose of the deemed exchange.

Petitioner offers as a business reason for exchanging Wesleyan Station for the Barnes & Noble Corner that the exchange allowed petitioner to reunite ownership of the Barnes & Noble Corner with the rest of Rivergate and yielded operating efficiencies and increased the overall value of the reunited property. Yet, beyond self-serving testimony, petitioner offers no evidence to support that claim. We need not, and do not, accept that testimony. See Mendes v. Commissioner, 121 T.C. 308, 320 (2003) ("This Court is not bound to accept a taxpayer's self-serving, unverified, and undocumented testimony."). Moreover, even had petitioner shown a legitimate business purpose for the acquisition of the Barnes & Noble Corner, that would not necessarily preclude a finding that either the deemed exchange of Wesleyan Station for the Barnes & Noble Corner or Treaty Fields's deemed sale of Wesleyan Station had as a principal purpose the avoidance of Federal income tax. See sec. 1031(f)(2)(C).

### c.  Teruya Bros. Distinguished

Petitioner argues that there is a critical difference between the transaction at bar and the transaction in Teruya Bros., Ltd. & Subs. v. Commissioner, 124 T.C. 45 (2005): "[Petitioner] did NOT structure the Wesleyan Station exchange with the intention of avoiding the purposes of subsection 1031(f)".  Petitioner argues that there was no "prearranged plan" for Security Bank to acquire the Barnes & Noble Corner and to exchange it with petitioner:  "[Petitioner] affirmatively planned all along to swap Wesleyan Station through a Qualified Intermediary for new replacement property owned by a completely unrelated third party."

Apparently, petitioner seeks to rely on a negative inference to be drawn from an example in the legislative history of section 1031(f).  H. Rept. 101-247 (1989) is the report of the Committee on the Budget[4] that accompanied H.R. 3299, 101st Cong., 1st Sess. (1989), which, as enacted, became OBRA.  As stated, OBRA section 7601(a) added section 1031(f).  With respect to that addition, the report provides the following example of a transaction that would violate section 1031(f)(4):

> [I]f a taxpayer, pursuant to a prearranged plan, transfers
> property to an unrelated party who then exchanges the
> property with a party related to the taxpayer within 2 years

---

[4] Including as tit. XI of the report, from the Committee on Ways and Means, an explanation of the revenue provisions of the accompanying bill, which, among other things, added sec. 1031(f).

of the previous transfer in a transaction otherwise qualifying under section 1031, the related party will not be entitled to nonrecognition treatment under section 1031. [H. Rept. 101-247, supra at 1341.]

Petitioner seems to believe that the presence or absence of a "prearranged plan" is dispositive of a violation of section 1031(f)(4). Petitioner insists that it, unlike the taxpayer in Teruya Bros., had no prearranged plan to use property from a related person to complete a like-kind exchange. Although we set forth the above example in Teruya Bros., and although the taxpayer in that case did have a prearranged plan, we did not make much of that fact. Indeed, outside of the example, we did not even use the phrase. See Teruya Bros., Ltd. & Subs. v. Commissioner, supra. The example, therefore, is just that: one of many transactions that will fall afoul of section 1031(f)(4).[5]

As stated supra in section II.E.2.b. of this report, in considering whether petitioner's actual exchange with Security Bank was part of a transaction or series of transactions structured to avoid the purposes of section 1031(f), we must determine whether, with respect to a hypothetical direct exchange of properties between petitioner and Treaty Fields followed by a hypothetical sale by Treaty Fields of the property received,

---

[5] In Teruya Bros., Ltd. & Subs. v. Commissioner, 124 T.C. 45, 53 (2005), we described the example as "highly elliptical". A commentator has said of it: "Because of the way this example is drafted, it appears not to make the point for which it is offered." Mandarino, "Reconciling Rulings on Related Party Like-Kind Exchanges", 30 Real Estate Taxn. 174, 175 (2003).

petitioner has shown the absence of a principal purpose of Federal income tax avoidance. Even if petitioner convinced us that the actual exchange was not prearranged (which it has not[6]), we would still need to determine the application to the hypothetical facts of the non-tax-avoidance exception of section 1031(f)(2)(C).

d. Conclusion

Petitioner has failed to prove that neither its deemed exchange of Wesleyan Station with Treaty Fields for the Barnes & Noble Corner nor Treaty Fields's deemed sale of Wesleyan Station thereafter had as one of its principal purposes the avoidance of Federal income tax.

---

[6] While the uncontradicted testimony of petitioner's witnesses is that, at least initially, petitioner planned to swap Wesleyan Station for property from an unrelated person, petitioner had turned its attention exclusively to the Barnes & Noble Corner by Oct. 9, 2003, the day it engaged Security Bank as qualified intermediary and 1 day before Security Bank sold Wesleyan Station on petitioner's behalf. Indeed, petitioner's president, Dwight Jones, testified that the sec. 1031(a)(3)(A) deadline of 45 days after the transfer of relinquished property to identify replacement property is so short a period to negotiate price and to do due diligence that to identify and designate replacement property within that period is "just about impossible". Moreover, on Oct. 15, 2003, 6 days after petitioner relinquished Wesleyan Station, it agreed to purchase the Barnes & Noble Corner from Treaty Fields. Taking into account Dwight Jones's testimony about the time constraints imposed by sec. 1031(a)(3)(A), that indicates to us that petitioner had sometime before that date identified the Barnes & Noble Corner as the replacement property for Wesleyan Station. We believe that, on Oct. 10, 2003, the day Security Bank sold Wesleyan Station for petitioner, petitioner had a "prearranged plan" for the Barnes & Noble Corner to be received in exchange, and we so find.

3. Conclusion

The end result of petitioner's exchange of Wesleyan Station with Security Bank for the Barnes & Noble Corner is the same as if petitioner had made an exchange of Wesleyan Station with Treaty Fields followed by Treaty Fields's sale of Wesleyan Station.  Petitioner has failed to show that the deemed transaction lacked as a principal purpose the avoidance of Federal income tax.  Therefore, the actual exchange is part of a transaction structured to avoid the purposes of section 1031(f) and, under section 1031(f)(4), the nonrecognition provisions of section 1031 do not apply to that exchange.

F. Conclusion

We sustain the deficiency in tax respondent determined.

III. Section 6662 Accuracy-Related Penalty

A. Applicable Law

Section 6662(a) provides for an accuracy-related penalty equal to 20 percent of the portion of any underpayment of tax attributable to, among other things, negligence or intentional disregard of rules or regulations (without distinction, negligence), any substantial understatement of income tax, or any substantial valuation misstatement.  See sec. 6662(b)(1)-(3). Although the notice states that respondent bases his imposition of a penalty of $403,172 on "one or more" of those three grounds,

on brief he relies on only the first two of those grounds: negligence and substantial understatement of income tax.

Negligence has been defined as lack of due care or failure to do what a reasonably prudent person would do under like circumstances. See, e.g., <u>Hofstetter v. Commissioner</u>, 98 T.C. 695, 704 (1992). It also "includes any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws or to exercise ordinary and reasonable care in the preparation of a tax return." Sec. 1.6662-3(b)(1), Income Tax Regs.

For corporations such as petitioner, a substantial understatement of income tax exists if the amount of the understatement for the taxable year exceeds the greater of (1) 10 percent of the tax required to be shown on the return for the taxable year, or (2) $10,000. Sec. 6662(d)(1)(B).

Section 6664(c)(1) provides that the accuracy-related penalty shall not be imposed with respect to any portion of an underpayment if it is shown that there was reasonable cause for that portion and the taxpayer acted in good faith with respect to that portion. Further:

> The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. * * * Reliance on * * * professional advice * * * constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith. * * *

Sec. 1.6664-4(b)(1), Income Tax Regs.; see also sec. 1.6664-4(c), Income Tax Regs. ("Reliance on opinion or advice").

B. <u>Analysis</u>

There was a substantial understatement of petitioner's taxable year 2004 income tax within the meaning of section 6662(d)(1).

Mr. Pippin prepared petitioner's 2004 Form 1120, including the attached Form 8824, which reported the exchange of Wesleyan Station for the Barnes & Noble Corner as a like-kind exchange. Mr. Pippin is a C.P.A. and a member of the largest accounting firm in the Macon area, and he and his firm have more experience representing real estate developers than anyone else in Macon. Dwight Jones (petitioner's president) had relied on Mr. Pippin and his firm for tax advice for many years. Dwight Jones had great confidence in him and relied on him to prepare properly petitioner's tax returns. Mr. Pippin was aware of all facts relevant to the exchange of Wesleyan Station for the Barnes & Noble Corner. He was required to interpret section 1031(f)(4) in preparing petitioner's 2004 return. As our exposition of that section in <u>Teruya Bros., Ltd. & Subs. v. Commissioner</u>, 124 T.C. 45 (2005), and this report show, that provision is not without its interpretative difficulties. When petitioner filed its 2004 Form 1120, we had not yet decided <u>Teruya Bros.</u> Granted, respondent had issued a revenue ruling, Rev. Rul. 2002-83, 2002-2

C.B. 927, presaging the result in that case, but we do not think that the ruling left the result free from doubt or that, given the facts before him, Mr. Pippin made unreasonable legal assumptions. We conclude that, with respect to petitioner's underpayment in tax attributable to its failure to report the gain it recognized on the exchange of Wesleyan Station for the Barnes & Noble Corner, petitioner, in relying on Mr. Pippin to prepare properly its return, had reasonable cause for the underpayment and acted in good faith, and we so find.

    C.   <u>Conclusion</u>

    Petitioner is not liable for the section 6662(a) penalty respondent determined.

<u>An appropriate decision will</u>

<u>be entered for respondent</u>.