T.C. Memo. 2011-297

UNITED STATES TAX COURT

RAY FELDMAN, TRANSFEREE, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 26737-08, 27386-08,     Filed December 27, 2011.
            27387-08, 27388-08,
            27389-08, 27390-08,
            27391-08, 27392-08,
            27393-08.

Robert Edward Dallman, for petitioners.

George W. Bezold, for respondent.

_____

[1]Cases of the following petitioners are consolidated
herewith for opinion:  Sharon L. Coklan, Transferee, docket No.
27386-08; Jill K. Reynolds, Transferee, docket No. 27387-08; Jan
Reynolds, Transferee, docket No. 27388-08; Carrie Donahue,
Transferee, docket No. 27389-08; Rhea Dugan, Transferee, docket
No. 27390-08; Emma McClintock, Transferee, docket No. 27391-08;
Robert Donahue, Transferee, docket No. 27392-08; and Richard
Feldmann, Transferee, docket No. 27393-08.

MEMORANDUM FINDINGS OF FACT AND OPINION

SWIFT, Judge:  In these consolidated cases respondent determined transferee liability against petitioners relating to an agreed and unpaid $593,979 Federal income tax liability of Woodside Ranch Resort, Inc. (Woodside Ranch), for 2002, plus an addition to tax, penalties, and interest relating to Woodside Ranch's unpaid 2002 Federal income tax liability.  The amount of each petitioner's respective transferee liability as calculated by respondent is as follows:  Ray Feldman--$542,514; Sharon L. Coklan--$117,013; Jill K. Reynolds--$42,550; Jan Reynolds--$212,751; Carrie Donahue--$95,738; Rhea Dugan--$41,274; Emma McClintock--$95,738; Robert Donahue--$21,275; and Richard Feldmann--$309,765.

The transferee liability determined against each petitioner is based largely on respondent's conclusion that a purported July 18, 2002, sale[2] by petitioners of shares of stock in Woodside Ranch constituted a sham transaction not dissimilar from the abusive tax-avoidance transaction described in Notice 2001-16, 2001-1 C.B. 730 (referred to as an intermediary transaction).

---

[2]In our findings of fact, use of the words "sale", "purchase", and similar words generally is for convenience and is not intended to and does not constitute a finding that the referenced transactions constituted a valid transaction to be recognized for Federal income tax purposes.

The issue for decision is whether petitioners are liable under section 6901 as transferees for their respective shares of Woodside Ranch's $593,979 Federal income tax liability for 2002, plus the addition to tax, penalties, and interest.[3]

FINDINGS OF FACT

Many of the facts have been stipulated and are so found.

At the time of filing their separate petitions, petitioners resided in Wisconsin, Florida, and Arizona.  Trial was held on November 17, 2010, in Milwaukee, Wisconsin.

In the 1920s Woodside Ranch was established and began business as a Wisconsin corporation with its place of business in Mauston, Wisconsin.

From its incorporation until May of 2002 Woodside Ranch owned and operated a dude ranch resort offering, among other activities, horseback riding, swimming, boating, hiking, fishing, snow skiing, and snowmobiling, along with accommodations.

The historic shareholders in Woodside Ranch were William Feldman and his five children.  In 2002, at the time of the transactions before us, Woodside Ranch stock was owned by 10 shareholders, 9 of whom were grandchildren or great-grandchildren of William Feldman.  They are petitioners herein.  The 10th

---

[3]Unless otherwise indicated, all section references are to the Internal Revenue Code applicable to the year before us, and all Rule references are to the Tax Court Rules of Practice and Procedure.

shareholder, Lucille Nichols, daughter of William Feldman, has died, and her estate is not involved in these consolidated cases.

Just before the 2002 transactions involved in these cases, the officers of Woodside Ranch were:  President--decedent Lucille Nichols; vice president--Richard Feldmann; secretary--Ray Feldman; and treasurer--Carrie Donahue.  These same individuals also were the directors of Woodside Ranch.

On average, each year 6 to 20 accidents resulting in injuries to customers occurred at Woodside Ranch.  Only a few of these accidents resulted in formal claims against Woodside Ranch. The injuries that occurred at Woodside Ranch typically were not serious, and personal injury claims were satisfied by Woodside Ranch with in-kind compensation (e.g., free return visits to the ranch for the injured customers and their families) plus the payment by Woodside Ranch of medical expenses.  After the transactions described below that occurred in the spring and summer of 2002, only one personal injury claim against Woodside Ranch resulted in a payment to an injured customer.  That payment was for $50,000.

Although the sporting and other activities at Woodside Ranch involved some risk of personal injury for Woodside Ranch customers, over the years Woodside Ranch did not obtain comprehensive personal injury insurance covering potential injuries.  Such comprehensive insurance was available but

expensive, and management of Woodside Ranch chose not to purchase it.  Woodside Ranch did carry several insurance policies that covered some activities at the ranch.[4]  As stated, for many years including 2002 Woodside Ranch management was unwilling to pay the high cost of comprehensive liability insurance covering participant sports activities.

Sale of Woodside Ranch's Assets

In the late 1990s and early 2000s the owners and management of Woodside Ranch faced significant challenges to the continued operation of the ranch:  Increased competition from Wisconsin casinos and water parks; aging of the Woodside Ranch shareholders and directors; and lack of interest on the part of the shareholders and the Feldman next generation in continued operation of the ranch.  As a result, the shareholders of Woodside Ranch began a search for a buyer of either their stock in Woodside Ranch or of the assets of Woodside Ranch.

The shareholders were interested in minimizing the tax liabilities associated with a sale of their interests in Woodside Ranch.  A corporate asset sale would trigger significant Federal and State corporate income tax liabilities.[5]

---

[4]For example, Woodside Ranch carried landlord/tenant-type insurance relating to the buildings and property.

[5]In an opinion letter, Woodside Ranch's accountant estimated that a sale of Woodside Ranch assets would trigger Federal and State corporate income taxes of approximately $595,700 and

(continued...)

In the fall of 2001 negotiations began with an individual named Damon Zumwalt (Zumwalt) for the sale of Woodside Ranch, with the expectation on both sides that commercial operation of the dude ranch would be continued by Zumwalt.  A stock sale was proposed to Zumwalt, who "just laughed and chuckled and said, 'not on your life, it's got to be an asset sale'."

On May 17, 2002, after several months of negotiations, the operating assets and business of Woodside Ranch were sold to Woodside Ranch, LLC (WRLLC), for $2.6 million in cash (hereinafter often referred to as the asset sale or the Zumwalt asset sale).  Zumwalt was the sole owner and sole member of WRLLC.  On this asset sale, the net cash proceeds received by Woodside Ranch were $2,301,089.

In a June 5, 2002, memorandum to the Woodside Ranch shareholders, petitioner Ray Feldman referred to the above estimated taxes as posing a "dilemma" for the shareholders. Also, Woodside Ranch management and shareholders were aware that under Wisconsin law they might be able to limit their individual liability relating to potential personal injury claims of customers arising from ranch activities if the sale of Woodside Ranch took the form of a stock sale with the new owners of the

---

[5](...continued)
$152,000, respectively.

Woodside Ranch stock assuming the liabilities of Woodside Ranch, including risks relating to potential personal injury claims.[6]

The total combined Federal and State income tax liability that Woodside Ranch incurred on the asset sale was approximately $750,000, of which the officers, directors, and shareholders of Woodside Ranch at all relevant times were aware.

After the asset sale to Zumwalt, Woodside Ranch had no operating assets and ceased to engage in any meaningful business activity.

Efforts To Avoid Payment of Tax Liabilities

In the early spring of 2002 Fred Farris (Farris), an accountant and financial adviser to Woodside Ranch and to some of the individual shareholders, introduced the Woodside Ranch officers, directors, and shareholders to MidCoast Credit Corp. and to MidCoast Acquisition Corp. (collectively MidCoast). MidCoast was owned directly or indirectly 50 percent by Michael Bernstein and 50 percent by Honora Shapiro.

Representatives of MidCoast claimed to have expertise in tax matters and provided to the Woodside Ranch officers promotional materials which outlined a potential tax-avoidance transaction as an alternative to a liquidation of Woodside Ranch.

---

[6]If a liquidation of Woodside Ranch occurred, creditors would be able to bring claims directly against Woodside Ranch shareholders who received corporate assets on the liquidation. See Wis. Stat. Ann. sec. 180.1408(2) (West 2002).

Under the transaction presented by the MidCoast representatives, the shareholders of Woodside Ranch allegedly would be relieved of a significant portion, if not all, of Woodside Ranch's combined Federal and State income tax liability of approximately $750,000 relating to the Zumwalt asset sale.

On June 11, 2002, in spite of the MidCoast promotional materials that had been received, the Woodside Ranch finance committee, consisting of petitioners Carrie Donahue, Ray Feldman and Richard Feldmann, met and adopted a resolution recommending that a plan of liquidation for Woodside Ranch be adopted.

However, the Woodside Ranch board of directors did not adopt the recommended plan of liquidation, and the Woodside Ranch directors chose instead to pursue the alternative tax-avoidance transaction proposed by MidCoast mentioned above and described more specifically below.

As reflected in written notations of petitioner Ray Feldman of a meeting that apparently occurred later in the day on June 11, 2002, the MidCoast representatives explained that under the MidCoast proposal MidCoast would purchase bad debts from entities unrelated to target corporations (such as Woodside Ranch) and would use the bad debts to offset or eliminate unpaid tax liabilities of the newly acquired target corporations. The MidCoast representatives explained that the "Income comes in tax

free by using NOL", and "So * * * [you] <u>create</u> * * * [a] loss-- lower deferred tax liability".  (Emphasis added.)

On June 17, 2002, MidCoast representatives explained over the phone to Woodside Ranch officers that if Woodside Ranch was not liquidated and if the cash Woodside Ranch received on the Zumwalt asset sale was not distributed directly to the shareholders, but instead the shareholders agreed to sell to MidCoast their Woodside Ranch stock, MidCoast would pay to the MidCoast shareholders a "'premium' of approximately $200,000 to 250,000" for their stock (hereinafter sometimes referred to as the MidCoast premium).

The MidCoast premium that the Woodside Ranch shareholders would receive was to be calculated as a percentage (between 25 and 33 percent) of the approximate combined Federal and State corporate income tax liability Woodside Ranch had incurred as a result of the Zumwalt asset sale.  Notations reflecting the MidCoast representations explain:  "The exact figure for the premium would be set on a percentage formula based upon the amount of State and Federal tax owed as a result of sale of Woodside assets to Damon Zumwalt and Woodside Ranch, LLC."

Representatives of MidCoast repeatedly explained to the Woodside Ranch officers that if the Woodside Ranch stock was sold to MidCoast or to a MidCoast-related entity, MidCoast or its related entity would obtain bad debt losses from other companies

and use those losses to offset or eliminate the tax liabilities of Woodside Ranch.

The transaction proposed by the representatives of MidCoast was also referred to by the MidCoast representatives as a "no-cost liquidation". (Emphasis added.) In other words, instead of directly liquidating Woodside Ranch and distributing to the Woodside Ranch shareholders the cash proceeds from the Zumwalt asset sale (less the combined Federal and State tax liability that would have been paid), the MidCoast proposal was designed so that the cash, in effect, still could be "liquidated" or transferred to the Woodside Ranch individual shareholders, but indirectly and via a few additional steps, as follows: A purported or nominal sale of the Woodside Ranch stock to MidCoast; a transfer by MidCoast to the Woodside Ranch individual shareholders of the cash that would have been distributed to the shareholders on a direct liquidation of Woodside Ranch (i.e., the net proceeds available from Woodside Ranch for a liquidating distribution plus a "premium"--one-third of the taxes owed); and MidCoast would avoid paying the tax liabilities the Woodside Ranch shareholders would have had to pay on a direct liquidation. All this allegedly was to be made possible by MidCoast's use of bad debt losses from other companies to offset the reportable Woodside Ranch gain on the Zumwalt asset sale.

On June 17, 2002, Woodside Ranch's finance committee met and adopted a resolution to pursue further with the shareholders the sale of Woodside Ranch's stock to MidCoast as proposed in the MidCoast promotional materials.

As reflected in minutes of a June 17, 2002, Woodside Ranch finance committee meeting, the amount MidCoast would pay the Woodside Ranch shareholders for 100 percent of the outstanding Woodside Ranch stock would not be based on the value of the Woodside Ranch stock. (Such a valuation would have included the approximate $1.8 million in cash that Woodside Ranch had on hand from the Zumwalt sale.) Rather, the minutes state that the amount to be paid would be based on the premium or a percentage (approximately 33 percent) of the taxes due on the Zumwalt sale. The minutes state as follows:

> [T]he sale of 100% of the stock of Woodside Ranch Resorts, Inc., shareholders to MidCoast Investments, Inc. in exchange for a "premium" of approximately $200,000 to $250,000. The exact figure or total amount of the payment for the premium would be set on a percentage formula based upon the amount of State and Federal tax owed as a result of sale of Woodside assets * * *.

As described in the above minutes, the proposal from MidCoast to pay approximately $250,000 for 100 percent of the Woodside Ranch stock was not tied to the value of Woodside Ranch stock or to the $1.8 million in cash that Woodside Ranch had on hand, but on a split of Woodside Ranch's tax liabilities intended to go unpaid or be offset via the use of net operating losses

(NOLs). In the above minutes, no mention is made of the cash Woodside Ranch held from the Zumwalt asset sale.

The minutes of the June 17, 2002, finance committee meeting also state that, upon a purchase by MidCoast, Woodside Ranch would

> become part of * * * [MidCoast's] staple of companies that they are supervising for the purpose of utilizing tax losses which they acquired by buying credit card companies bad debts and losses to offset against profitable "C Corps" who have a situation like Woodside's wherein a large tax * * * [liability exists] * * *.

The obvious and only benefit to MidCoast and its owners was that they would end up with cash in their pockets equal to two-thirds of the amount of Woodside Ranch's unpaid tax liabilities.

During the weeks that the Woodside Ranch representatives were in discussion with the MidCoast representatives, Woodside Ranch representatives made a number of phone calls and undertook to find out information about MidCoast. However, we are not convinced, and in our opinion the credible evidence in these cases does not establish, that the Woodside Ranch shareholders and their representatives undertook a sufficiently in-depth and thorough due diligence investigation of MidCoast.

On June 18, 2002, MidCoast sent a letter of intent to Woodside Ranch in which MidCoast represented that--on the basis of 30 percent of the Woodside Ranch estimated $750,000 combined Federal and State tax liability--the Woodside Ranch shareholders

together would receive approximately $210,000 more if the nominal stock sale to MidCoast was used, thereby converting the liquidation into the referred-to "no-cost" liquidation. The following comparison chart was included in the letter of intent to estimate roughly the promised benefits of the MidCoast transaction:

| | Shareholders Liquidate Company w/out MidCoast | Shareholders Sell Stock of Company to MidCoast [The "No Cost" Liquidation] |
|---|---|---|
| Asset Sales Proceeds | $2,600,000 | $2,600,000 |
| Less: Federal & State Income Taxes | (747,704) | (747,704) |
| Less: RE Commission | (117,000) | (117,000) |
| Less: Title Insurance | (2,000) | (2,000) |
| Less: Notes Payable | (318,400) | (318,400) |
| Less: Misc. Adjustments | (8,000) | (8,000) |
| Net Proceeds Available to Shareholders | 1,406,896 | N/A |
| Plus: MidCoast Premium to Shareholders | N/A | 224,311 |
| MidCoast Stock Purchase Price [or "Net Proceeds Available to Shareholders"] | N/A | 1,631,207 |

On June 19, 2002, petitioner Ray Feldman sent a letter to the other Woodside Ranch shareholders discussing, among other things, MidCoast's proposal. Specifically, petitioner Ray Feldman noted:

The assets * * * [were] sold by the deed and bill of sale on May 17th to [WRLLC] which of course is owned by

Damon Zumwalt.  Therefore, the corporation Woodside
Ranch Resort, Inc. is basically an "empty shell" but
which consists of the cash at the time of sale of Two
Million Two Hundred Seventy Six Thousand eighty-eight
Dollars and fifty-six cents.

\*       \*       \*       \*       \*       \*       \*

MidCoast promises \* \* \* to pay Woodside's taxes because
the corporation would not be liquidated but instead be
kept alive as a going concern as part of the MidCoast
organization.  This deal is profitable for MidCoast
because MidCoast purchases large amounts of defaulted
and delinquent credit card amounts from the major
credit card companies \* \* \* and carries forward such
losses to offset against the purchase of "profitable"
corporations such as Woodside.

On the basis of the above evidence we have summarized (and
contrary to some testimony and documentary evidence in these
cases), it is absolutely clear that all individuals involved with
Woodside Ranch and MidCoast were aware that MidCoast and its
representatives had no intention of ever paying the tax
liabilities of Woodside Ranch and also that the source of the
approximately $225,000 MidCoast premium to be received by the
Woodside Ranch shareholders was to come from the unpaid tax
liability.

On June 27, 2002, a limited liability company was formed
under the name of Woodsedge, LLC (Woodsedge), with the Woodside
Ranch shareholders as its sole members, each having the same
ownership percentage in Woodsedge as they had in Woodside Ranch.

On July 11, 2002, petitioners Ray Feldman and Richard
Feldmann met with MidCoast representatives and others to discuss

further the terms of the proposed purchase of the Woodside Ranch stock by MidCoast, referred to as a share purchase agreement (SPA). During that meeting, petitioners raised a question about their exposure to transferee liability relating to Woodside Ranch's tax liabilities.

On July 18, 2002, for reasons not clear in the trial record, Woodside Ranch redeemed 154 of the outstanding shares of Woodside Ranch stock and distributed therefor to its shareholders $300,326 in cash and other assets (the redemption proceeds). The parties explain that the fair market value of the redemption proceeds was later reduced to $293,728, and the total redemption proceeds were assigned and transferred by the Woodside Ranch shareholders to Woodsedge.

After the above partial redemption and moments before the effective date of the stock sale to MidCoast, Woodside Ranch had $1,835,209 in cash on hand from the Zumwalt asset sale and an approximate combined Federal and State income tax liability of $750,000.

Also on July 18, 2002, the Woodside Ranch shareholders and MidCoast entered into the SPA. Under the SPA, the stated purchase price to MidCoast for the Woodside Ranch stock was "equal to (a) the amount of Cash-on-Hand, less (b) $492,139.20". The $492,139.20 represented a percentage (roughly 70 percent) of

the estimated "Deferred Tax Liabilities" of approximately $750,000.

Still on July 18, 2002, in anticipation of the closing of the SPA, two escrow agreements were executed:  The first by MidCoast, Woodside Ranch, the Woodside Ranch shareholders, and the law firm of Foley & Lardner (Foley) (hereinafter referred to as the sellers' escrow agreement); the second by MidCoast, Honora Shapiro (Shapiro), Shapiro's attorney, and Foley (hereinafter referred to as purchasers' escrow agreement).

Under both escrow agreements Foley was to act as escrow agent and all funds involved in the stock sale were to be wired into and out of the same trust account of the Foley law firm (the trust account).

On July 18, 2002, the following steps were taken:

(1) $1,835,209 (Woodside Ranch's remaining cash on hand from the Zumwalt asset sale and after the $300,326 cash redemption) was transferred into the trust account;

(2) $1.4 million from Shapiro was transferred into the trust account purporting to represent a loan from Shapiro to MidCoast allegedly to fund the MidCoast stock purchase;[7]

(3) the purported sale to MidCoast by the Woodside Ranch shareholders of their remaining Woodside Ranch stock closed;

---

[7]The record does not indicate that the purported Shapiro "loan" was evidenced by a promissory note, nor that Shapiro received any security or collateral relating thereto.

(4) $1,344,452 (viz., the $1,835,209 cash less the $492,139 portion of the combined Federal and State tax liability to be retained by MidCoast) (hereinafter sometimes referred to as the Woodside Cash)[8] was transferred from the trust account into an account of Woodsedge in favor of petitioners and which amount included the approximate $225,000 MidCoast premium;

(5) $1.4 million was transferred back to Shapiro in return of the purported loan Shapiro had made to MidCoast earlier that same day (see (2) above); and

(6) $38,000 was transferred out of the trust account to Foley for legal and escrow fees.[9]

Section 7.1 of the SPA states that the above cash transfers were to be treated as occurring simultaneously. The schedule below highlights the reality that the above cash transfers occurred on the same day and within minutes or hours of each other:

| July 18, 2002 | Event |
| --- | --- |
| 12:09 p.m. | $1,835,209 Woodside Ranch cash transferred into the Foley trust account; |
| 1:34 p.m. | $1.4 million cash purportedly lent from Shapiro to MidCoast transferred into the Foley trust account; |
| 3:35 p.m. | $1,344,451 cash transferred out of the Foley trust account into an account of Woodsedge in favor of petitioners; |

---

[8]Cash of $1,835,209 less $492,139 equals $1,343,070. The record does not explain why an extra $1,382 was transferred from the Foley trust account into the Woodsedge account in favor of the Woodside Ranch shareholders.

[9]Farris' accounting firm also received a $25,000 finder's fee for introducing MidCoast to the Woodside Ranch shareholders.

3:36 p.m.      $1.4 million cash transferred out of the trust account back to Shapiro.

Per the sellers' escrow agreement, both the $1,344,451 (which petitioners received out of escrow on the purported sale of their stock to MidCoast) and the $452,728.84 (which MidCoast received) were to be paid, and they were paid from the sellers' escrow fund into which was deposited the $1,835,209 proceeds from the asset sale.  In the sellers' escrow agreement, no express mention is made of any other funds being deposited into escrow to be transferred to the sellers.  We quote from the express language of the sellers' escrow agreement:

> The Escrow Agent acknowledges receipt of the aggregate amount of * * * $1,835,209.08 (such amount, less distributions therefrom in accordance with this Agreement, being referred to herein as the "Escrow Fund") from * * * [Woodside Ranch].
>
>    *       *       *       *       *       *       *
>
> The Escrow Agent shall immediately on the Closing Date * * * pay over to (A) Woodsedge on behalf of the * * * [petitioners] from the Escrow Fund $1,344,451.52 by wire transfer of immediately available funds to a bank account of * * * [petitioners'] designation set forth in the Instructions; (B) * * * [Woodside Ranch] from the Escrow Fund $452,728.84 by wire transfer of immediately available funds to a bank account of * * * [Woodside Ranch's] designation set forth in the Instructions.

Per the purchaser's escrow agreement, the purported $1.4 million loan from Shapiro was not to be disbursed until the $1,835,209 proceeds of the Woodside Ranch asset sale were placed into the escrow fund, and only then was:  $1,344,351 to be

disbursed to Woodsedge on behalf of the Woodside Ranch shareholders; $452,728.84 to be disbursed to Midcoast; and $1.4 million to be "immediately" returned to Shapiro without interest. The closing statement shows $1.4 million coming from Shapiro and going back to Shapiro as part of the very same closing transaction.

The $1.4 million from Shapiro came into escrow only momentarily and went right back to Shapiro without ever serving a legitimate, economic purpose in this transaction. Were it a legitimate loan, the $1.4 million would have been outstanding for a period of time and would have had some business purpose. Interest would have been charged. There would have been a written promissory note. The $1.4 million from Shapiro constitutes a ruse, a recycling, a sham.

Within 4 days after the SPA closed, the $452,729 balance in the trust account was transferred out of the trust account into a SunTrust bank account in the name of Woodside Ranch, which by that point in time was controlled by MidCoast.

On or about July 22, 2002, April 2003, and August 8, 2005, each of the individual Woodside Ranch shareholders received from Woodsedge his or her respective share of the $293,728 redemption proceeds and of the $1,344,451 cash that passed through the Foley trust account as described above.

Included in the SPA was a representation by the shareholders of Woodside Ranch that, as of the time of the SPA, Woodside Ranch had no liabilities, direct or contingent, other than the combined Federal and State tax liability.

Included in the SPA was a guarantee and release in favor of petitioners to the effect that, as between petitioners and MidCoast, the maximum amount MidCoast could seek from petitioners relating to personal injury claims made by customers of Woodside Ranch was equal to the $224,311 MidCoast premium (i.e., to the portion of the taxes that were to go unpaid and that were to be retained by petitioners).[10]

Also, the SPA contained a provision prohibiting MidCoast from liquidating or dissolving Woodside Ranch within 4 years of the July 18, 2002, closing of the stock sale.[11]

Woodside Ranch After the Closing of the Purported Stock Sale

After the purported stock sale to MidCoast, MidCoast was the nominal sole shareholder of Woodside Ranch. Woodside Ranch had $452,729 cash on hand, a combined Federal and State tax liability

---

[10]As stated earlier, after the above transactions with MidCoast, petitioners made only one payment relating to personal injury claims arising from activities of Woodside Ranch before July 18, 2002, which resulted in a payment by petitioners and others of $50,000.

[11]Petitioners presumably wanted this provision both as added protection against potential personal injury claims arising from Woodside Ranch activities and to protect against petitioners' personal exposure to transferee liability for Woodside Ranch's unpaid income tax liabilities relating to the asset sale.

of approximately $750,000, and no operating assets. Woodside Ranch was rendered insolvent as a result of the payment by it of the redemption proceeds, the payment of the Woodside cash to the Woodside Ranch shareholders, and the return to Shapiro of his $1.4 million.

After the above transactions with MidCoast, Woodside Ranch had no paid employees and no income (other than nominal interest income). However, MidCoast charged Woodside Ranch a "professional service fee" of $250,000, and from August to December 2002 MidCoast charged Woodside Ranch $30,000 per month as a management fee, even though there were essentially no assets to manage. Woodside Ranch's SunTrust account records show withdrawals of $300,000 and $142,000 on July 19 and 22, 2002, respectively. As a result of these withdrawals, Woodside Ranch was unable to pay the July or August 2002 management fees it nominally owed MidCoast.

An amount of $1,181,249 was entered on the books of Woodside Ranch as a loan due from MidCoast to Woodside Ranch. This purported loan receivable in favor of Woodside Ranch apparently was based on the treatment of the $1.4 million in cash that, on July 18, 2002, was returned out of the Foley trust account to Shapiro. Woodside Ranch and MidCoast treated part (i.e., $1,181,249) of the $1.4 million returned to Shapiro as if it had

been returned to Shapiro not by MidCoast, but by Woodside Ranch and that MidCoast somehow owed Woodside Ranch $1,181,249.

In December of 2003 MidCoast purportedly sold all of the stock of Woodside Ranch to Wilder Capital Holdings, LLC (Wilder), for no cash and for the "assumption" by Wilder of MidCoast's purported $1,181,249 loan obligation to Woodside Ranch.

Wilder made no payment on this purported loan assumption, and within 1 month, by January 29, 2004, the purported $1,181,249 loan and a promissory note of Wilder's relating thereto were marked "paid".[12]

On September 12, 2003, Woodside Ranch's 2002 Federal corporate income tax return was filed showing a tax due of $454,292, all relating to the Zumwalt asset sale. By that time, Woodside Ranch, of course, had no funds, and Woodside Ranch's Federal income tax liability was not paid with the filing of the return.

On February 22, 2005, Woodside Ranch's 2003 Federal corporate income tax return was filed claiming a net operating loss (NOL). This claimed NOL was carried back to 2002 and thereby reduced Woodside Ranch's reported 2002 Federal income tax liability to zero.

---

[12]Wilder's obligation on the assumed purported Midcoast debt to Woodside Ranch should have been, were it legitimate, reflected in a promissory note running from Wilder in favor of Woodside Ranch. In fact, however, a promissory note of Wilder relating thereto was issued in favor of MidCoast.

Woodside Ranch was administratively dissolved on August 13, 2009.

On audit, respondent disallowed all but $5,432 of the 2003 NOL claimed by Woodside Ranch on the grounds that the NOL was based on sham loans and was part of an illegal distressed asset/debt (DAD) tax shelter.  Petitioners have stipulated that this DAD tax shelter was illegal, that the claimed 2003 NOL was not allowable, and that respondent properly disallowed the NOL carryback to 2002.[13]

On September 11, 2006, respondent sent to Woodside Ranch a notice of deficiency setting forth respondent's determination of Woodside Ranch's $594,000 Federal income tax deficiency for 2002 plus an estimated tax penalty under section 6654, delinquency additions to tax under section 6651(a)(2) and (3), and an accuracy-related penalty under section 6662(b)(1).  Woodside Ranch did not file a petition in this Court challenging the

---

[13]Generally, in a DAD tax shelter a domestic partnership claims a loss relating to a purported contribution of a built-in loss asset.  The partnership typically will contribute the asset to a lower tier partnership, which in turn will sell that asset to another (sometimes related) entity, thereby purportedly incurring a significant loss.  The reported loss passes through to the upper tier partnership, which allocates and passes through the loss to the domestic partners; the domestic partners offset other income or gain with the purported loss.  The overall effect is that the domestic partner-taxpayers reap the benefits of the built-in loss asset without ever having incurred the costs associated therewith.  See IRS Coordinated Issue Paper, "Distressed Asset/Debt Tax Shelters", LMSB-04-0407-031 (Apr. 18, 2007).

notice of deficiency, nor did Woodside Ranch file a complaint in any other court relating to its 2002 Federal income tax liability.

Petitioners took no actions to ensure that the Woodside Ranch Federal income tax liability triggered by the Zumwalt asset sale would be paid[14] and, as stated, it remains unpaid.[15]

Respondent investigated whether Woodside Ranch had any available assets from which to collect Woodside Ranch's unpaid 2002 Federal income tax liability and determined that it had none.

On September 15, 2008, respondent sent notices of transferee liability to petitioners, each notice identifying Woodside Ranch as the transferor with an unpaid Federal income tax liability of approximately $594,000 plus additions to tax, penalties, and

---

[14]Sec. 2.11 of the SPA provided that

> All Taxes due and payable by the Company on or prior to the Closing Date, including without limitation those which are called for by the Tax Returns, or heretofore claimed to be due by any taxing authority from the Company, have been paid, except for the Deferred Tax Liability, which liability is assumed by the Purchasers hereunder.

Sec. 2.9 of the SPA defines "Deferred Tax Liability" and apparently limits it to $703,056.

[15]It should be noted that the Woodside Ranch $153,725 Wisconsin corporate income tax liability for 2002 was paid by MidCoast when MidCoast representatives learned (apparently to their surprise) that Wisconsin law did not permit NOL deductions to be carried back and to offset prior year State corporate income tax liabilities.

interest for a total of $1,057,216.  The transferee notices indicated the total amount each petitioner received in the stock redemption and purported stock sale and calculated each petitioner's individual transferee liability accordingly.

An attachment to each notice of transferee liability stated in relevant part:

> It is determined that the transaction in which shareholders of Woodside Ranch Resort, Inc. purportedly * * * sold stock of Woodside Ranch Resort, Inc. to MidCoast Acquisitions Corporation and MidCoast Credit Corporation on July 18, 2002 is not respected for tax purposes.  This transaction is substantially similar to an Intermediary transaction shelter described in notice 2001-16, 2001-1 C.B. 730 and Notice 2008-20, 2008-6 I.R.B. 406.
>
> It is determined that, in substance, Woodside Ranch Resort, Inc. ceased business activity on July 18, 2002, and that the allocation set forth in Exhibit 1 [showing petitioners' share of the deemed transferred assets] is attributable to you in liquidation or distribution of assets of Woodside Ranch Resort, Inc. on that date.[16]

## OPINION

In determining whether petitioners are liable under section 6901 as transferees for Woodside Ranch's unpaid Federal income tax liability, we first consider whether the July 18, 2002, purported stock sale between petitioners and MidCoast is, for Federal income tax purposes, to be recognized as such or is to be treated as a sham.

---

[16]Petitioners do not contest their liability as transferees relating to the $293,729 redemption proceeds they received.

Economic Substance or Sham

Taxpayers generally are free to structure their business transactions as they wish, even if motivated in part by tax reduction considerations. Gregory v. Helvering, 293 U.S. 465 (1935); Rice's Toyota World, Inc. v. Commissioner, 81 T.C. 184, 196 (1983), affd. on this issue 752 F.2d 89 (4th Cir. 1985).

However, a transaction which lacks economic purpose and substance other than sought-after tax avoidance may be treated as a sham and disregarded for Federal income tax purposes. Frank Lyon Co. v. United States, 435 U.S. 561 (1978); Rice's Toyota World, Inc. v. Commissioner, supra at 196. The economic substance of a transaction, rather than its form, controls. Commissioner v. Court Holding Co., 324 U.S. 331 (1945); Gregory v. Helvering, supra; Amdahl Corp. v. Commissioner, 108 T.C. 507, 516-517 (1997).

The "labels, semantic technicalities, and formal written documents do not necessarily control the tax consequences of a given transaction." Houchins v. Commissioner, 79 T.C. 570, 589 (1982); see also Ocmulgee Fields, Inc. v. Commissioner, 613 F.3d 1360, 1368 (11th Cir. 2010), affg. 132 T.C. 105 (2009); Teruya Bros., Ltd. v. Commissioner, 580 F.3d 1038, 1043 (9th Cir. 2009), affg. 124 T.C. 45 (2005); Yosha v. Commissioner, 861 F.2d 494, 499 (7th Cir. 1988), affg. Glass v. Commissioner, 87 T.C. 1087 (1986).

As we recently stated, for Federal income tax purposes a transaction may be disregarded if the transaction was entered into not for valid business purposes but rather for "tax benefits not contemplated by a reasonable application of the language and purpose of the Code or its regulations." Palm Canyon X Invs., LLC v. Commissioner, T.C. Memo. 2009-288. Even if a transaction is not treated as a sham, it still may be recast in order to reflect its true nature. Gaw v. Commissioner, T.C. Memo. 1995-531 (citing Packard v. Commissioner, 85 T.C. 397, 419-422 (1985)), affd. without published opinion 111 F.3d 962 (D.C. Cir. 1997).

Courts often interpret the Supreme Court's holding in Frank Lyon Co. v. United States, supra, as establishing an economic substance doctrine with two prongs: Whether the taxpayer had a nontax business purpose or objective for entering into the disputed transaction (the subjective prong); and whether the transaction had economic substance beyond the anticipated tax benefits (the objective prong). See, e.g., Karr v. Commissioner, 924 F.2d 1018, 1023 (11th Cir. 1991), affg. Smith v. Commissioner, 91 T.C. 733 (1988); Bail Bonds by Marvin Nelson, Inc. v. Commissioner, 820 F.2d 1543, 1549 (9th Cir. 1987), affg. T.C. Memo. 1986-23; Rice's Toyota World, Inc. v. Commissioner, 752 F.2d at 91-92; Palm Canyon X Invs., LLC v. Commissioner, supra.

Some courts use a disjunctive approach and treat a transaction as having economic substance if the transaction has either a business purpose or economic substance.  See, e.g., Rice's Toyota World, Inc. v. Commissioner, 752 F.2d at 91-92.  Some courts use a conjunctive approach and treat a transaction as having economic substance only if the transaction has both a business purpose and economic substance.  See, e.g., Dow Chem. Co. v. United States, 435 F.3d 594, 599 (6th Cir. 2006).  Yet other courts collapse the objective and subjective prongs into one comprehensive inquiry.  See, e.g., Sacks v. Commissioner, 69 F.3d 982, 988 (9th Cir. 1995), revg. T.C. Memo. 1992-596; Kirchman v. Commissioner, 862 F.2d 1486, 1492 (11th Cir. 1989), affg. Glass v. Commissioner, 87 T.C. 1087 (1986).

The Court of Appeals for the Seventh Circuit has stated generally that "It is well-established that the Commissioner is not required to recognize, for tax purposes, those transactions which lack economic substance."  Muhich v. Commissioner, 238 F.3d 860, 864 (7th Cir. 2001), affg. T.C. Memo. 1999-192. "[T]ransactions with no economic substance don't reduce people's taxes."  Cemco Investors, LLC v. United States, 515 F.3d 749, 752 (7th Cir. 2008); Grojean v. Commissioner, 248 F.3d 572 (7th Cir. 2001), affg. T.C. Memo. 1999-425; Muhich v. Commissioner, supra at 864 (citing Gregory v. Helvering, supra); see also Coleman v.

<u>Commissioner</u>, 16 F.3d 821 (7th Cir. 1994), affg. T.C. Memo. 1990-99 and T.C. Memo. 1987-195.

The Court of Appeals for the Eleventh Circuit recently noted that "Even if the transaction has economic effects, it must be disregarded if it has no business purpose and its motive is tax avoidance."  <u>United Parcel Serv. of Am., Inc. v. Commissioner</u>, 254 F.3d 1014, 1018 (11th Cir. 2001); see also <u>Kirchman v. Commissioner</u>, <u>supra</u> at 1492 ("The focus of the inquiry under the sham transaction doctrine is whether a transaction has economic effects other than the creation of tax benefits." (citing <u>Knetsch v. United States</u>, 364 U.S. 361 (1960))).  In <u>Kirchman v. Commissioner</u>, <u>supra</u> at 1492, the Court of Appeals for the Eleventh Circuit noted further:

> The analysis of whether a transaction is a substantive sham, however, addresses whether a transaction's substance is that which it form represents.  That does not necessarily require an analysis of a taxpayer's subjective intent.  Once a court determines a transaction is a sham, no further inquiry into intent is necessary.

The Court of Appeals for the Ninth Circuit has recently discussed in an unpublished opinion the economic substance doctrine and its two prongs as follows:  "'(1) whether * * * [taxpayers] demonstrated that either of the principals directing their respective transactions had a business purpose for engaging in the transaction other than tax avoidance and (2) whether either transaction had economic substance beyond the creation of

tax benefits.'"  Thomas Inv. Partners, Ltd. v. United States, 108 AFTR 2d 2011-5369, at 2011-5371, 2011-2 USTC par. 50,517, at 86,287 (9th Cir. 2011) (quoting Casebeer v. Commissioner, 909 F.2d 1360, 1363 (9th Cir. 1990)).

The Court of Appeals in Thomas concluded that the transactions under scrutiny were unlikely to confer a nontax benefit and that the individuals who engaged in those transactions did so solely to create tax benefits.  Id. at 2011-5372, 2011-2 USTC par. 50,517, at 86,287.  Further, the Court of Appeals has stated that "the consideration of business purpose and economic substance are simply more precise factors to consider in the application of this court's traditional sham analysis".  Sochin v. Commissioner, 843 F.2d 351, 354 (9th Cir. 1988), affg. Brown v. Commissioner, 85 T.C. 968 (1985).

Before us in these cases is a purported stock sale between petitioners and MidCoast that lacks both business purpose and economic substance and that we conclude is to be disregarded for Federal income tax purposes.  In substance, there was no sale of the stock of Woodside Ranch; rather, Woodside Ranch was liquidated, and the $1,835,209 cash that Woodside Ranch had on hand (after the partial redemption that occurred on July 18, 2002) was distributed to the Woodside Ranch shareholders less a fee of approximately $500,000 that MidCoast retained for facilitating the sham.

The "no-cost liquidation" terminology used by the MidCoast representatives is telling. In substance, it really was a liquidation, not a stock sale. The effort, assisted by MidCoast's sleight of hand, to reduce the tax cost of the Woodside Ranch liquidation by cloaking the liquidation in the trappings of a stock sale is to be ignored.

We emphasize that at the same time Shapiro transferred $1.4 million into the trust account, $1.4 was immediately returned to Shapiro. Inferentially, the approximately $1.3 million the Woodside Ranch shareholders received out of the trust account came to them from the $1.8 million in proceeds of the Zumwalt asset sale--as a corporate distribution. In substance, Woodside Ranch was liquidated, and petitioners received the $1.3 million as liquidation proceeds.

The $1,181,249 reported loan receivable in favor of Woodside Ranch from MidCoast obviously was a mere accounting device, devoid of substance. As we have emphasized, the $1.4 million Shapiro placed into the escrow on July 18, 2002, was returned to Shapiro 2 hours later, and thereafter no portion thereof was owed by anyone to anyone. Shapiro had his $1.4 million. MidCoast did not owe him anything. Woodside Ranch did not owe him anything, and MidCoast did not owe Woodside Ranch anything with regard thereto.

What was transferred by Woodside Ranch to MidCoast did not actually represent equity in Woodside Ranch. See Owens v. Commissioner, 568 F.2d 1233, 1238 (6th Cir. 1977), affg. in part and revg. in part 64 T.C. 1 (1975). On July 18, 2002, Woodside Ranch's assets consisted only of cash. All of the operating assets and business of Woodside Ranch had been sold to Zumwalt. After the asset sale and partial redemption, but before the purported stock sale, Woodside Ranch had $1,835,209 cash on hand and a combined Federal and State corporate income tax liability of approximately $750,000.

From the time of the purported stock sale, Woodside Ranch carried on no business activity; there was no viable business to continue, and, on the basis of our evaluation of the evidence and testimony before us, representations from MidCoast that Woodside Ranch would be incorporated into MidCoast's "asset-recovery" business are preposterous.

After the July 18, 2002, transaction, Woodside Ranch was nothing more than a shell, with no employees, no real property, and no assets other than MidCoast's share of the unpaid taxes.

Petitioners argue emphatically that if Woodside Ranch had been liquidated, Woodside Ranch's management and shareholders might have ended up facing unexpected and unknown claims and lawsuits against them personally under Wisconsin law. Indeed, petitioners argue that the Woodside Ranch shareholders' concern

over potential liability claims was dominant and that the shareholders' concern over taxes due on the Zumwalt asset sale was only secondary.

As we have found, however, whatever the level of perceived risk the Woodside Ranch management and shareholders actually had in operating Woodside Ranch, it was not enough of a risk to convince them to purchase anything more than spotty or discrete personal injury insurance.

Over the years, Woodside Ranch had relatively few personal injury claims brought against it relating to activities of the ranch and then only in amounts not disclosed in the record.

On the facts and credible evidence before us, we conclude that petitioners had little basis for being concerned for their potential personal liability on unknown claims and lawsuits arising out of the activities of Woodside Ranch.[17]

The June 17, 2002, minutes of the Woodside Ranch finance committee meeting establish that both the MidCoast representatives and the Woodside Ranch shareholders knew and

---

[17]We also find it remarkable that the Woodside Ranch shareholders and MidCoast capped the liability of the Woodside Ranch shareholders for personal injury claims relating to ranch activities to the amount of the MidCoast premium (i.e., to the amount the shareholders were to receive from the unpaid taxes). Apparently, the individuals involved in the transactions before us thought the unpaid taxes (or a portion thereof) should be the measure not only of MidCoast's fee, but also the measure and limit of the shareholders' liability for personal injury claims. The unpaid taxes were to serve dual purposes.

understood that the only real payment MidCoast was making to the Woodside Ranch shareholders was calculated as, and in fact constituted, nothing more than a split of the projected tax liabilities that no one intended to pay.

The real price to be paid by MidCoast for the stock had nothing to do with the value of Woodside Ranch; rather, the stock purchase by Midcoast was a sham, and MidCoast was simply splitting between itself and the Woodside Ranch shareholders the amount of the taxes that should have been paid.

The MidCoast representative said it correctly when he stated that the transaction before us was all about creating tax avoidance; it was not supported by underlying economic substance and business activity. The only entity that was to fund, or incur, the cost of the transaction before us was the Federal Government via unpaid taxes.

Petitioners argue that the SPA provision under which Woodside Ranch was not to be dissolved for 4 years confirms their good faith and intent that the tax liabilities would be paid, and confirms their concern over personal liability for personal injury claims against Woodside Ranch. We disagree. We regard the SPA provision as essentially meaningless. While under the control of MidCoast, Woodside Ranch failed to pay its taxes, claimed other illegal tax-avoidance tax shelters, and was effectively given away by MidCoast for nothing.

We conclude that in substance the transaction before us was not a bona fide sale of Woodside Ranch stock. The substance of the transaction was a liquidation to petitioners of Woodside Ranch's cash and a fee payment to MidCoast for its role in facilitating the sham.

Transferee Liability

Section 6901(a) provides a procedure through which respondent may collect from transferees of assets unpaid taxes owed by the transferors of the assets if a legal basis exists under State law or equity for holding the transferees liable for the unpaid taxes. Commissioner v. Stern, 357 U.S. 39, 42-47 (1958); Hagaman v. Commissioner, 100 T.C. 180, 184-185 (1993). Transferee liability under section 6901 includes related additions to tax, penalties, and interest owed by the transferors. Kreps v. Commissioner, 42 T.C. 660, 670 (1964), affd. 351 F.2d 1 (2d Cir. 1965). Respondent bears the burden of proving that petitioners are liable as transferees of the property of Woodside Ranch. See sec. 6902(a); Rule 142(d).

We apply Wisconsin law in our analysis of whether petitioners should be held liable as transferees of Woodside Ranch.

Wisconsin shareholders of a dissolved corporation may be liable as transferees to creditors of the corporation (such as respondent) where the shareholders receive corporate assets as

part of a dissolution.  Wis. Stat. Ann. sec. 180.1408(2) (West 2002) provides:

> If the dissolved corporation's assets have been distributed in liquidation, a claim not barred under sec. 180.1406 or 180.1407 may be enforced against a shareholder of the dissolved corporation to the extent of the shareholder's proportionate share of the claim or the corporate assets distributed to him or her in liquidation, whichever is less, but a shareholder's total liability for all claims under this section may not exceed the total amount of assets distributed to him or her.  As computed for purposes of this subsection, the shareholder's proportionate share of the claim shall reflect the preferences, limitations and relative rights of the class or classes of shares owned by the shareholder as well as the number of shares owned, and shall be equal to the amount by which payment of the claim from the assets of the corporation before dissolution would have reduced the total amount of assets to be distributed to the shareholder upon dissolution.

Income tax liabilities arising from the sale of corporate assets are "claims" existing at the time of the sale.  See Kreps v. Commissioner, supra at 670-671.  This Court has held that at the time of an intermediary transaction asset sale (not dissimilar from the transaction herein), the Commissioner qualified as a creditor of the seller for Federal taxes arising from the sale.  LR Dev. Co., LLC v. Commissioner, T.C. Memo. 2010-203 (discussing Illinois definitions of the terms "debt" and "claim" which are the same as under Wisconsin's fraudulent transfer statute).

Having found that the transaction before us in substance and purpose was part of a liquidation and dissolution of Woodside

Ranch and that the Woodside Ranch shareholders received, as a part of that liquidation and dissolution, approximately $1.3 million in cash as a distribution from Woodside Ranch, we conclude that petitioners are liable as transferees under the above provision of Wisconsin law for their proportionate shares of Woodside Ranch's unpaid 2002 Federal income tax liability.

Wisconsin also has adopted the Uniform Fraudulent Transfer Act, codified at Wis. Stat. Ann. secs. 242.01 to 242.12 (West 2009) (Wisconsin UFTA), which provides creditors with certain remedies where a debtor transfers property and thereby avoids creditor claims. If the elements of the Wisconsin UFTA are satisfied, creditors may obtain an attachment or other remedy against the property transferred and against the transferees and their property. Wisconsin UFTA sec. 242.07.

Respondent does not argue that petitioners should be liable as transferees under Wisconsin UFTA section 242.04(1)(a), a provision that requires a debtor's actual intent to defraud, hinder, or delay a creditor. However, respondent argues that under two closely related provisions of the Wisconsin UFTA petitioners should be treated as transferees and as liable for the unpaid Federal income tax liability of Woodside Ranch.

Wisconsin UFTA section 242.04(1)(b) is applicable where:

> [T]he debtor made the transfer or incurred the obligation: * * * Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (1) Was engaged or was

about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (2) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Wisconsin UFTA section 242.05(1) is applicable where:

[T]he debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Wisconsin statutes do not define "reasonably equivalent value". The Uniform Fraudulent Transfer Act is a uniform act deriving the phrase "reasonably equivalent value" from 11 U.S.C. section 548. Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide, Ltd.), 139 F.3d 574, 577 (7th Cir. 1998); Bowers-Siemon Chems. Co. v. H.L. Blachford, Ltd., 139 Bankr. 436, 445 (Bankr. N.D. Ill. 1992) ("Illinois law on fraudulent conveyance parallels sec. 548 of the Bankruptcy Code."). Whether reasonably equivalent value was received by the transferor is a question of fact. Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide, Ltd.), supra at 576 (citing Heritage Bank Tinley Park v. Steinberg (In re Grabill), 121 Bankr. 983, 994 (Bankr. N.D. Ill. 1990)).

In the bankruptcy context, the Court of Appeals for the Seventh Circuit has stated that the "test used to determine reasonably equivalent value in the context of a fraudulent

conveyance requires the court to determine the value of what was transferred and to compare it to what was received." Barber v. Golden Seed Co., 129 F.3d 382, 387 (7th Cir. 1997).

Under the Wisconsin UFTA, creditors, such as respondent, have the burden to prove the above elements of transferee liability by clear and convincing evidence. Kaiser v. Wood Cnty. Natl. Bank & Trust Co. (In re Loyal Cheese Co.), 969 F.2d 515, 518 (7th Cir. 1992); Mann v. Hanil Bank, 920 F. Supp. 944, 950 (E.D. Wis. 1996).

Petitioners do not dispute Woodside Ranch's liability for the Federal income taxes arising from the Zumwalt asset sale, nor the existence of respondent's claim therefor or respondent's creditor status at the time of the transfers in question.

On the evidence before us, it is clear that in exchange for the distribution of approximately $1.3 million in cash to petitioners Woodside Ranch received nothing of reasonably equivalent value.

After the Zumwalt asset sale, Woodside Ranch ceased to engage in any business activity. There was no viable business to continue, and regardless of how MidCoast chose to describe its post-sale intentions for Woodside Ranch, the only "business" left for Woodside Ranch was to pay its tax liabilities arising from the asset sale. The transfer of Woodside Ranch's $1.3 million to petitioners left Woodside Ranch with remaining assets of

approximately $453,000 in cash, insufficient to pay Woodside Ranch's Federal and State income tax liabilities exceeding $700,000.

It is clear that as a result of Woodside Ranch's cash distribution to petitioners, Woodside Ranch was rendered insolvent. See Wisconsin UFTA sec. 242.02(b)(2) ("A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.").

Further, the Woodside Ranch shareholders should have known that the Federal income tax liability arising from the Zumwalt asset sale would not be paid. The credible evidence before us establishes that petitioners' interest in the MidCoast transaction relied almost entirely on the assumption and calculation that the Woodside Ranch tax liability would remain unpaid; the impetus for taking the cumbersome route of a nominal stock sale was the mutual understanding between petitioners and MidCoast that each party would pocket and retain a portion of the unpaid taxes.

MidCoast offered a "no-cost" liquidation as a solution to the tax "dilemma" in which petitioners found themselves. In spite of representations to the contrary in some of the transaction documents, the record is replete with notice to petitioners that MidCoast never intended to pay Woodside Ranch's Federal income tax liability.

On the credible evidence before us, we conclude that petitioners knew or should have known that, as a result of the transactions among Woodside Ranch, MidCoast, and petitioners, Woodside Ranch had debts beyond its ability to pay.

We conclude that petitioners herein are liable as transferees under both of the above provisions of the Wisconsin UFTA for their proportionate shares of Woodside Ranch's unpaid 2002 Federal income tax liability.

Lastly, under what respondent refers to as a common law "trust fund" doctrine relating to fiduciary duties of corporate directors and officers, petitioners should be treated as transferees and as liable for the unpaid Federal income tax liability of Woodside Ranch.  Respondent cites Beloit Liquidating Trust v. Grade, 677 N.W.2d 298, 309 (Wis. 2004), which explained that when a corporation is insolvent and has ceased to be a going concern and its directors and officers know, or ought to know, that suspension of the corporation is pending, transfers of corporate property to the directors or officers in lieu of payments to creditors of the corporation may be held to constitute a fraud on the creditors and the directors and officers may be held personally liable to the injured creditors. See also Polsky v. Virnich, 779 N.W.2d 712, 714 (Wis. Ct. App. 2010).

Under the above alternate authority, respondent argues that all petitioners should be held liable under Wisconsin law and under section 6901 as transferees. As noted, however, this Wisconsin common law authority would apply only to petitioners who were directors and officers of Woodside Ranch (namely, to Ray Feldman, Richard Feldmann, and Carrie Donahue), not to petitioners who were neither directors nor officers of Woodside Ranch.

In light of our conclusion and holding herein that petitioners are liable under Wis. Stat. Ann. sec. 180.1407, the Wisconsin UFTA, and section 6901 for their respective shares of Woodside Ranch's 2002 unpaid Federal income tax liability, we need not, and we do not decide whether any petitioners also should be held liable under the above common law authority on which respondent relies.

In two recent Memorandum Opinions and in a Memorandum Opinion filed today, this Court has addressed transferee liability relating to other transactions promoted by Midcoast. See Frank Sawyer Trust of May 1992 v. Commissioner, T.C. Memo. 2011-298 (filed Dec. 27, 2011); Starnes v. Commissioner, T.C. Memo. 2011-63 (decision entered Mar. 24, 2011), on appeal (4th Cir., June 8, 2011); Griffin v. Commissioner, T.C. Memo. 2011-61 (decision entered Sept. 30, 2011). In the above three cases this

Court held in favor of the taxpayers.  Those cases involved differences from the instant cases.

Starnes and Frank Sawyer Trust were decided largely on the basis of insufficiency of and burden of proof.

In Griffin, after the transaction with MidCoast, the target corporation retained substantial assets and was not thereby rendered insolvent.  Additionally, the taxpayer filed a lawsuit and obtained a State court judgment against MidCoast in an effort to get the taxes paid.

In Starnes, Griffin, and Frank Sawyer Trust, the facts as found did not establish that the taxpayers knew that MidCoast intended not to pay the taxes.

For the reasons stated, we sustain respondent's determination that petitioners are liable as transferees with respect to their respective shares of the 2002 unpaid Federal income tax liability of Woodside Ranch and the related additions to tax, penalties, and interest.

Decisions will be entered for respondent.